## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PX-18-631** |
| | * | |
| **SCOTT WILLIAMS ET AL.,** | * | |
| | * | |
| **Defendants.** | * | |
| | ****** | |

### GOVERNMENT'S OMNIBUS MOTIONS RESPONSE

On December 12, 2018, a federal grand jury returned an indictment charging defendants Scott Williams ("Williams") and Taeyan Williams ("Taeyan") with conspiracy to distribute controlled substances (including marijuana, cocaine, and more than 500 grams of methamphetamine), and separately charged Williams with possession with intent to distribute controlled substances and possession of firearms in furtherance of a drug trafficking crime.

On December 18, 2019, the grand jury returned a superseding indictment that charged Williams in Count Four with murder in furtherance of the drug trafficking conspiracy charged in Count One. Williams then moved to sever Count Four from the remaining counts (ECF 39), exclude evidence of victim Noah Smothers's murder (ECF 41), and dismiss the indictment for failure to prosecute (ECF 42). Williams has also moved to suppress physical evidence and statements obtained during the execution of a search warrant on his residence (ECF 16). The government opposes Williams's motions.

## BACKGROUND

In October 2019, Detective Simms—who led the investigation into Smothers's murder—affirmed an affidavit in support of federal warrants to search electronic devices, search electronic accounts, and obtain cell site data ("the affidavit"). Ex. 1. The affidavit details the evidence against Williams and provides the following facts that are pertinent to Williams's motions.

### I.    *Introduction*

The investigation revolved around the murder of Noah Smothers, who's been missing since April 6, 2018. Smothers was born in 1995 in New York. He attended Gettysburg College in Pennsylvania, but never graduated. According to Individual 1—who was Smothers's long-time friend and business partner—Smothers eventually attended the University of California Davis, where he studied agriculture and learned to cultivate marijuana. After attending the University of California Davis, Smothers returned to the East Coast.

Around that time, Smothers and Individual 1 started a relatively large marijuana operation. Individual 1 moved to Los Angeles, where he made connections with organic marijuana growers and Shipping Company 1—a company that was willing to transport large quantities of marijuana across the country. For his part, Smothers rented a unit at a storage facility in Jessup, Maryland ("the storage facility"). Individual 1 used Shipping Company 1 to transport the organic marijuana to Smothers, and Shipping Company 1 used Smothers's access pin number to enter the facility in Jessup and place the packages in

Smothers's storage unit. Smothers then collected the marijuana and distributed it in wholesale quantities to college students in Maryland, West Virginia, and Pennsylvania. By all accounts, Smothers was a prolific (though non-violent) marijuana distributor.

In 2017 Smothers entered the world of poly-drug distribution and went into business with Williams and Taeyan. Williams was a cocaine and methamphetamine dealer from Jamaica. Taeyan is Williams's son, and like Smothers sold marijuana and cocaine to college students. At one point, Smothers told Individual 1 that he trusted Williams and even stayed at Williams's house, which is located at 10301 Bristolwood Court in Laurel, Maryland ("the Bristolwood Court residence") and was likely the sight of Smothers's murder.

In March 2018, Individual 1 was seriously injured in a car accident, and for several weeks could not ship marijuana to Smothers. In early April 2018, once Individual 1 had sufficiently recovered from his injuries, he shipped approximately 100 pounds of organic marijuana worth hundreds of thousands of dollars to Smothers's storage facility. This was the largest single distribution Individual 1 ever made to Smothers.  It also offered an opportunity for Williams to rob Smothers. The day after the marijuana was delivered to Smothers's storage unit, Smothers met with Williams at the Bristolwood Court property to discuss the future of their drug distribution partnership. He was never seen again.

## II.   *Smothers's Disappearance*

On April 5, 2018 at around 1:08 p.m., surveillance cameras show Shipping Company 1 enter Smothers's storage facility, and contemporaneous records show that the

3

driver used Smothers's pin number to get into the facility. The video then shows the driver for Shipping Company 1 deliver several large boxes to Smothers's unit.[1]

Geolocation data associated with Smothers's cell phone shows that on April 5, 2018 at around 12:43 p.m., Smothers was in Pennsylvania. That day, Smothers drove to Gettysburg College where he spent time with Individual 2, a female acquaintance of Smothers. Later that day, Smothers told Individual 2 that he had a family emergency and needed to leave. Location data from Smothers's cell phone shows that Smothers then travelled to Maryland. From the cell phone location data, Google records, surveillance video, business records, license plate readers, witness testimony, and search warrant evidence, the government constructed the following timeline of Smothers, Taeyan, and Williams's activities surrounding the time of the murder.

*Noah Smothers (April 5, 2018)*

- At 5:36 p.m., surveillance video and contemporaneous records show Smothers enter the storage facility in a Kia with Ohio tag HCK-3975 ("the Kia") that Smothers rented two weeks earlier from Enterprise.[2] Smothers uses his pin number to access the facility.

- At 6:00 p.m., surveillance video from the storage facility shows Smothers struggling to move several large boxes from his unit into his car. Six minutes later, Smothers exits the facility with the boxes in his car.

---

[1] The units are equipped with sensors that indicate when the units are opened, though Smothers's unit is not actually visible from the video.

[2] Smothers rented the vehicle on March 20, 2018.

- At 7:42 p.m., Smothers runs a Google search.[3]

- Around 10:00 p.m., Smothers checks into his AirBNB in Baltimore. Three hours earlier, Smothers writes to the property owner, "I apologize for not answering. There was a family emergency back at home that I had to leave town for. I will be using the bnb tonight." Cell phone location data places Smothers's cell phone in Maryland at 10:45 p.m. Four hours later, the AirBNB owner observes Smothers's car in front of the property.

*Noah Smothers (April 6, 2018)*

- At 6:49 a.m., Smothers runs the Google search "breakfast near me."

- At 7:51 a.m., surveillance video shows Smothers return to the storage facility. Smothers uses his pin number to access the facility, and the storage facility's sensors show that Smothers opened his unit.

- At 11:20 a.m., cell phone location data places Smothers's cell phone in Baltimore.

- At 12:00 p.m., Smothers checks out of the AirBNB.

- At 12:54 p.m., Smothers runs a Google search. At the time, Smothers is on or near the Baltimore Parkway near Williams's residence, *i.e.*, the Bristolwood Court property.

- At 1:32 p.m., Smothers runs his last known Google search. At the time, Smothers is 1.4 miles from Williams's residence.

- At 1:52 p.m., Smothers writes a note to his AOL account. The subject of the note was "Tae gave 5900 plus 4 wgs," and the note appears to be a ledger showing drugs Smothers sold Taeyan and the money Taeyan owed Smothers. Ex. 2.

- At 2:03 p.m., cell phone location data shows Smothers's cell phone hitting off a cell tower 2.8 miles from Williams's property (the Bristolwood Court residence). One hour and nine minutes later, Smothers's phone hits off a different cell tower 1.4 miles from Williams's property. The arches of the

---

[3] The Google searches are coded with locations. Thus, the Google searches on Smothers's phone indicated where Smothers was located at the time.

5

two towers intersect within feet of Williams's property, indicating that Smothers's phone was located on or near Williams's property when it went dead. Ex. 3.

- At 3:12 p.m., Smothers's outgoing phone activity completely stops. Smothers was never seen again.

*Taeyan Williams (April 6 and 7, 2018)*

- Records associated with Taeyan's phone show that he was at Williams's residence from 6:13 a.m. to 1:37 p.m., when he travelled away from the Bristolwood Court property.

- At 4:04 p.m., Taeyan texted a University of Maryland campus drug dealer, "I got your pens" (referring to THC vape pens). In addition to cocaine and marijuana, Smothers sold THC pens.

- At 7:17 p.m., Taeyan enters a note into his phone with the address to Smothers's storage facility. Ex. 4.

- At 3:57 a.m. the next morning (April 7, 2018), Taeyan enters another note into his phone, this time the login information for an encrypted cell phone account.

*Scott Williams (April 6 and 7, 2018)*

- On April 6, 2018, phone records show that Williams was at his Bristolwood Court property until 4:56 p.m., when Williams's phone was turned off.

- On April 7, 2018 around 2 p.m., Williams's phone turns on again after being off for close to 21 hours.

## III.   *Smothers's Kia and Storage Unit*

The evidence shows that after Smothers's phone shut off, Williams disposed of Smothers's car and burglarized Smothers's storage unit. On April 6, 2018 (the day Smothers went missing) at 8:37 p.m., a Nissan Altima ("the Altima") Williams rented arrived at the entrance of the storage facility and the driver used Smothers's pin to get

through the front gate. The Altima exited the facility a short time later, and the sensor records show that no units were opened.

At least the first time he entered the storage facility using Smothers's pin, Williams likely couldn't get into Smothers's unit. In addition to the front gate—which requires a pin to open—each unit is secured with a removable lock. Williams likely got into the facility using Smothers's pin, but realized that he couldn't get into Smothers's unit. Notably, after seizing Williams's cell phone pursuant to a search warrant on June 6, 2018, investigators found a deleted text message with no date or time information on Williams's phone that read "U got bolt cutters." This was one of few deleted messages on Williams's phone.

Additional evidence suggests that Williams was driving the Altima. Though the plates had been removed from the Altima, the car was the same make, model, and color as the car Williams rented from Enterprise three days earlier, which was equipped with Massachusetts tag 5XY974. Further, investigators located the Altima Williams rented after Williams returned the car to Enterprise and photographed unsecured screws on the plate, suggesting that the plate had recently been removed, consistent with the surveillance video from the storage facility depicting an Altima with missing plates. Ex. 5.

In the early morning hours of April 7, 2018, video surveillance from the lot of Apartment Complex 1 in Baltimore shows two subjects disposing of Smothers's Kia. Specifically, at 4:38 a.m., one of those subjects drives Smothers's Kia into the lot followed closely by a Nissan Altima. A license plate reader at the entrance to the lot captured the Altima's tag—Massachusetts tag 5XY-974—that matched the Altima that Williams rented

from Enterprise on April 3, 2018. Ex. 6. The video shows one of the subjects clean the interior of Smothers's Kia, then get into Williams's Altima before the two drive away.

On April 7, 2018 at 9:04 p.m., the Altima again drove to the entrance of the storage facility and entered Smothers's pin. Though the driver entered the correct pin, the gate didn't open because the facility closed at 9:00 p.m., and the Altima departed.

On April 8 at 11:13 a.m., Williams accessed his own storage locker at Cube Smart. Investigators who executed a search warrant on the unit found tools and car parts, evidence that when combined with the deleted bolt cutters text message, suggests that Williams went to his storage unit to get something to use on Smothers's removable lock at the storage facility. Nine hours after Williams went to Cube Smart, the Altima returned to the storage facility, and the driver again used Smothers's pin to get through the front gate. After the Altima entered the facility, the sensor on Smothers's storage unit was triggered. Surveillance video shows the Altima leaving shortly thereafter.

On April 11, 2018, Individual 3—an employee at the storage facility—noticed that Smothers's unit was unsecured and took photographs. The photographs show that the lock had been removed and that the contents of the boxes in the unit were gone. Ex. 7. Individual 3 tried calling Smothers, but her calls went to voicemail. Around that time, Smothers's parents reported their son missing to investigators. Smothers's friends and family told investigators that they had frequent contact with Smothers, and that if Smothers were alive, it would be extremely unlikely for him to go a significant period of time without contact.

To that end, the evidence shows that in early April 2018, Individual 1 shipped an extremely large quantity of marijuana to Smothers at the storage facility in Jessup. On April 6, 2018, Smothers went from the storage facility to Williams's residence on Bristolwood Court, where his phone went dead and from where he disappeared. Contemporaneously, Williams turned off his phone. In the early morning hours of April 7, 2018, a surveillance camera and license plate reader captured two individuals—one of whom was inferentially Williams and who was driving his own car—and the other of whom was driving Smothers's Kia, get rid of Smothers's Kia in the parking lot of Apartment Complex 1.

Between April 6 and 8, 2018, the Altima Williams rented went to Smothers's storage unit three times. After the third attempt to get into Smothers's storage unit, the unit was burglarized, and its contents—a valuable cache of marijuana Individual 1 shipped to Smothers—was stolen. Investigators recovered the Kia several weeks later.

## IV.   *Recovery of Smothers's Kia*

On April 26, 2018, Enterprise recovered the Kia from the parking lot of Apartment Complex 1. Government forensic analysts tested the Kia and found that it was essentially covered in blood, despite what appeared to be efforts to sterilize the car of evidence. The analysts found blood on the exterior of the car (*e.g.*, on the passenger door frame and near the trunk), and a substantial amount of blood pooled in the trunk. For instance, a photographed luminal test shows a pool of blood in the shape of a body in trunk of the Kia. Ex. 8. The blood tested positive for Smothers's DNA.

## V.   *Bristolwood Court Search Warrant*

Given the evidence that Smothers was murdered on Williams's property, that Williams burglarized Smothers's storage unit to steal Smothers's marijuana, and that Williams and an associate disposed of Smothers's Kia in Baltimore, investigators obtained a warrant to search the Bristolwood Court residence ("the search warrant"). Ex. 9.[4] On June 6, 2018, investigators executed the search warrant, where they found that Williams and Patti Ann Chaplin (Williams's girlfriend) were living in the master bedroom, and Williams's two young children were living in a separate bedroom. While executing the search warrant, investigators discovered the follows evidence:

- Three firearms in the master bedroom, including a Jennings-Bryco .380 caliber handgun, a Beretta .25 caliber handgun, and a Century Arms assault rifle.

- In the crawl space beneath Williams's staircase, a Sig Sauer 9mm handgun ("the Sig Sauer") that Williams used to murder Smothers.

- Several computers and cell phones.[5] A forensic analysis of one of the computers found in Williams's residence shows that around the time Smothers's phone went off, someone used the device to conduct numerous internet searches for the EZ Storage in Jessup (the name of Smothers's storage facility).

- Williams's Jamaican passport and other paperwork evincing Williams's residence at the Bristolwood Court address.

- A drug ledger outlining strains of marijuana, drug quantities, and the names "Tae, Me, or Team" written in the margins.

---

[4] On June 5, 2018, Circuit Court Judge Michael Pierson authorized the warrant to search the Bristolwood Court residence.

[5] The cell phones were searched pursuant to a separate search warrant. Ex. 13.

- 33 kilograms of marijuana. By their unique labels, Individual 1 later identified marijuana packages found at Williams's residence as the packages he shipped to Smothers's storage unit, further proving Williams's identity as the individual who burglarized Smothers's storage unit. Ex. 10.

- 2,018 pills of methamphetamine.

- 252 grams of cocaine.

- 45.5 grams of cannabis oil in vials (91 vials).

- 8.2 grams of THC in edible gummies (820 gummies). The gummies were identical to edibles Smothers sold, photographs of which Smothers posted to his Instagram profile. Ex. 11.

- $213,573 in United States currency.

- $4,650 in counterfeit currency.

That day, investigators interviewed Williams, who waived his *Miranda* rights and voluntarily spoke with the investigators. Ex. 14. Williams admitted that the firearms (including the Sig Sauer) and drugs located in the residence were his. Williams denied knowing Smothers by name or photograph, though Williams confirmed that other than himself, the only person who drove the Altima Williams's rented was someone named "Dennis." When asked for Dennis's phone number, Williams provided his own phone number (with the exception of one digit).[6]

Chaplin also spoke to the investigators, telling them that she lived in the residence with Williams and their children. Chaplin stated that Taeyan and Williams's brother

---

[6] A conversation forensically recovered from Williams's phone shows Williams attempting to obtain a fake identification in the name of Dennis Bell.

sometimes stayed in the basement bedroom of the house, but that there were no other full time residents of the Bristolwood Court property besides Chaplin, Williams, and the minor children. Chaplin—who had been in a romantic relationship with Williams for more than a decade—had never heard of Dennis Bell.

## VI.   *The Sig Sauer*

After the search warrant, forensic analysts tested the Sig Sauer found in Williams's crawl space for the presence of blood and DNA. Notably, in the slide of the Sig Sauer, the analysts found blood. The investigators then disassembled the Sig Sauer and found more blood pooled in the frame of the firearm. Ex. 12. The blood tested positive for Smothers's DNA. Notably, the area inside the slide and frame of the Sig Sauer would only be exposed during the brief moment after a round is discharged—when the firearm chambers a new round into the barrel. Thus, the fact that Smothers's blood was inside the slide and frame of the Sig Sauer indicates that the firearm was used to murder Smothers's at close range, and that Smothers's blood splattered into the frame and slide as the next round chambered.

## VII.   *Interview with Taeyan*

After the search warrant, the investigators interviewed Taeyan, who stated that he had a business relationship with Smothers, and that in general he sold cocaine and ecstasy to Smothers in exchange for marijuana. Taeyan added that the last time he saw Smothers was the day of Smothers's disappearance, and that at the time, Smothers was alone with Williams at the Bristolwood Court property. According to Taeyan, when he returned to the

Bristolwood Court property, Smothers was no longer there, and he never heard from or saw Smothers again.[7]

### VIII. *Drug Associates*

During the investigation, the government interviewed several witnesses who told the investigators that they were street level drug dealers, and that they purchased wholesale quantities of marijuana and cocaine from Taeyan. Individual 2—a good friend of Smothers who introduced Smothers to Taeyan (and by extension Williams)—recalled that Taeyan and his family owed Smothers upwards of $50,000, that Smothers was going to stop supplying marijuana to Taeyan until the debt was paid, and that the last time he saw Smothers alive, Smothers said that he was going to Maryland to meet with Taeyan and his family about the debt.

## ARGUMENT

The government starts with Williams's motions to sever counts, exclude evidence of Smothers's murder, and dismiss the indictment, which are all based on the common (though false) premise that the government "will be unable to cite any fact that ties the drugs and guns discovered" during the search warrant to Smothers's murder, and that any allegation that Smothers's murder was connected to the evidence found at Williams's residence is a "hunch with no basis in fact." *E.g.*, ECF 39 at 1. The government then turns Williams's motion to suppress the evidence recovered from Bristolwood Court.

---

[7] Though not described in the affidavit, when one of the detectives asked Taeyan if Smothers deserved what happened, Taeyan responded, "he should've moved smarter man. He was greedy . . . but no, he wasn't a bad guy."

## I.     *Motions to sever counts, exclude evidence, and dismiss indictment*

Rules 8(a) and 14 govern the Court's resolution of Williams's motion to sever. The former provides that an indictment "may charge a defendant in separate counts with two or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." The standard is not "onerous." *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003).

The rule "permits very broad joinder because of the efficiency in trying the defendant on related counts in the same trial." *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005) (holding that defendant's statement that he would have used gun to avoid arrest for murder for hire was sufficient to join Section 922(g) and murder charges); *United States v. Hawkins*, 776 F.3d 200, 206 (4th Cir. 2009) (noting that joinder is "the rule rather than the exception," though it is not "infinitely elastic," and "cannot be stretched to cover offenses . . . which are discrete and dissimilar").

In this case, Count Four charges Williams with murdering Smothers in furtherance of the drug conspiracy charged in Count One.[8] In other words, proof of Count One is an *element* of Count Four. To convict Williams of the murder count, the government will necessarily prove that Williams participated in a conspiracy to distribute marijuana,

---

[8] For the purpose of this opposition, the government primarily focuses on the reasons Counts One and Four should be tried together, since Williams does not argue that Counts One through Three should be severed from each other, and because Counts One through Three are inextricably linked.

cocaine, and more than 500 grams of methamphetamine, and that the purpose of the murder was related to the drug conspiracy charged in Count One. *United States v. Hager*, 721 F.3d 167 (4th Cir. 2013); *United States v. Aguilar*, 585 F.3d 652, 660 (2d Cir. 2009).

Legally speaking, the two counts involve common statutes and elements of proof. Using the nomenclature of Rule 8, the two charges—a drug conspiracy and a drug murder in furtherance of that exact same conspiracy—are of similar character, are based on the same acts and transactions, and are connected with parts of a common scheme or plan. *United States v. Hirschfeld*, 964 F.2d 318, 323 (4th Cir. 1992) (holding that joinder is proper when the two counts have a "logical relationship" to each other).

Because joinder under Rule 8(a) is proper, "the defendant's only recourse is to convince the court that the charges should be severed under Rule 14—a difficult task." *United States v. Blair*, 661 F.3d 755, 770 (4th Cir. 2011) (citing *Cardwell*, 433 F.3d at 387). The incidents where joinder of offenses is proper but severance is nevertheless required are limited to the "rare" case where joinder would "prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 768.

To that end, a defendant moving "for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice, and it is not enough to simply show that joinder makes for a more difficult defense." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984) (internal citations omitted); *United States v. Hackley*, 662 F.3d 671, 684 (4th Cir. 2011) ("It is not enough for the defendant to show that severance offers him a better chance of acquittal.") (internal quotation marks omitted). For those reasons, "the

general rule is that counts charged in the same indictment will be joined at trial." *United States v. Samuels*, 970 F.2d 1312, 1314 (4th Cir. 1992). The denial of a motion to sever is reviewed only for "clear prejudice." *United States v. Branch*, 537 F.3d 328, 341 (4th Cir. 2008).

The Fourth Circuit has several times affirmed joinder and the denial of severance of murder, drug conspiracy, and firearms charges where the murder was intended to further the drug conspiracy. *United States v. West*, 90 F. App'x 683, 688-89 (4th Cir. 2004) (affirming severance denial of CCE murder from drug conspiracy charge) (citing *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996)); *Hackley*, 662 F.3d at 683.[9]

As a starting point, the test for proper joinder and the denial of severance is not whether the murder was connected to a particular search warrant. Of course, the Bristolwood Court evidence is important—investigators found Williams in possession of a massive quantity of controlled substances, three handguns, an assault rifle, almost a quarter million dollars in cash, and other implements of the drug trade, much of which Williams admitted to possessing. But the conspiracy evidence is not limited to the search warrant. The investigation was remarkably large and complex, and the evidence the government will introduce at trial to prove the drug conspiracy will go beyond what was found in Williams's residence on a particular day.

---

[9] *Hackley* involved drug conspiracy, gun, and murder-for-hire charges, where the contract killing was intended to further the drug conspiracy. From the government's reading of *Hackley*'s procedural history, the defendant did not even argue that the murder and drug conspiracy charges should have been severed, instead only arguing for severance of the murder and Section 922(g) charges (an argument the Fourth Circuit rejected).

More importantly, the overwhelming premise of Williams's argument—that the government will offer no evidence connecting Smothers's murder to the evidence found at Williams's residence—is entirely wrong. For just a few examples of why this statement is so far off base, while executing the Bristolwood Court search warrant, the investigators (1) found the murder weapon concealed in Williams's crawl space, (2) found the marijuana Williams stole from Smothers in the days following the murder,[10] (3) found the edible THC gummies Smothers posted to his Instagram profile, (4) found a computer used to search for Smothers's storage facility in Jessup the day Smothers went missing, (5) found the methamphetamine that triggers the 10-year mandatory minimum that's necessary to support the murder charge, (6) found a quarter-kilogram of cocaine (*i.e.*, the drug that Taeyan and Williams sold to Smothers in exchange for marijuana), (7) found the proceeds of the drug conspiracy that the murder was intended to facilitate, (8) obtained a confession from Williams that the murder weapon was his, (9) obtained a functional confession that Williams was the only one who drove the Altima that was used to burglarize Smothers's storage unit and dispose of Smothers's Kia, and (10) found proof that Williams lived at the Bristolwood Court property—critical evidence in light of the evidence that Bristolwood Court was the site of Smothers's murder.

Two other points merit attention. First, in Count Three, Williams is charged with possessing the firearms found in the Bristolwood Court residence in furtherance of the

---

[10] *I.e.*, motive evidence and evidence that helps prove the murder was in furtherance of the drug conspiracy.

same drug trafficking conspiracy charged in Count One. Of course, the forensic evidence overwhelmingly indicates that one of those firearms was used to murder Smothers at close range. Severing Count Four from the remaining counts (including Count 3) would mean that Williams's possession of the murder weapon in furtherance of the drug trafficking conspiracy would be tried separately from murder in furtherance of the drug trafficking conspiracy using the same weapon, a nonsensical result that would conflict with *Hackley* and *Cardwell*. *Hackley*, 662 F.3d at 684 ("If contemplating using a gun to avoid arrest for murder for hire shows a sufficient relationship for joinder then surely contemplating using a gun in the murder for hire is also sufficient.").

Second, because the murder was an act in furtherance of the drug trafficking conspiracy, evidence of the murder would be admissible to prove the drug conspiracy, even if the Court granted severance. *West*, 90 F. App'x at 688-89 (affirming denial of CCE murder from drug conspiracy charge in part because evidence of murder would be admissible in drug conspiracy trial); *Chin*, 83 F.3d at 88 (holding that discussion of an uncharged murder-for-hire was properly admitted and was "inextricably intertwined with [the] crime of selling heroin and conducting an ongoing criminal enterprise"). Demonstrating sufficient prejudice to warrant severance is a difficult task for any defendant. It's that much more difficult when the evidence at the two trials would be largely the same. *United States v. Michael Lynn Vaughn*, PX-17-125, at \*3 (in determining whether joinder was proper, considering whether the charges involved "the same statutes, elements of proof, witnesses, or documentary evidence"). For the foregoing reasons, the Court

should deny Williams's motion to sever on the merits and motion to exclude evidence of the murder at the drug trial as moot.[11]

Regarding Williams's motion to dismiss for failure to prosecute, the government notes that this Court's practice is to resolve all pretrial motions at the same time. Knowing that the grand jury would return a superseding indictment charging Williams with capital murder, the government arranged a status call with the Court and defense counsel in advance of the response deadline. Between that status call and subsequent written communications with Chambers (where defense counsel was copied), the Court scheduled a follow-up status call and new response deadline that the government met with the filing of this opposition.[12]

## II.   *Motion to suppress Bristolwood Court evidence and statements*

Williams moves to suppress physical evidence and statements obtained during the execution of the Bristolwood Court search warrant. Williams argues that the affidavit was so lacking in probable cause as to defeat good faith, he was arrested without probable cause,

---

[11] Should the Court grant severance, under *West* and *Chin* the Court should permit evidence of the murder at the drug trial. The government can also supplement its response to ECF 41 as necessary should the Court disagree with the government's assessment that the motion is moot.

[12] Even accepting Williams's erroneous assertion that the government failed to respond to his motion to suppress by the December 2019 deadline, the government had good cause to ask for a continuance, as lead counsel for the government in *Williams* was also lead counsel in a complex white collar trial before this Court. *United States v. Kenneth Patrick Gaughan*, PX-18-492.

he made incriminating statements without *Miranda* warnings, and his incriminating statements were involuntary.[13]

### A.   Search Warrant Affidavit

Probable cause exists to search a location when "there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of crime and will be present at the time and place of the search." *United States v. Suarez,* 906 F.2d 977, 984 (4th Cir. 1990). The law "does not demand showing that such a belief be correct or more likely true than false." *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992).

A magistrate judge's "finding of probable cause is subject to great deference on review." *Suarez,* 906 F.2d at 984. For that reason, "the task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984); *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (reviewing court "may ask only whether the magistrate had a substantial basis . . . for concluding that probable cause existed").

The Fourth Circuit has routinely upheld warrants to search a defendant's residence for evidence of a crime without direct evidence connecting the crime to the residence. This is particularly true in drug cases. *United States v. Grossman*, 400 F.3d 212, 218 (4th Cir. 2005) ("Under the circumstances, it is reasonable to suspect that a drug dealer stores drugs

---

[13] The affidavit and corresponding warrant are attached as Ex. 9.

in a home to which he owns a key."). For instance, in the context of a warrant to search a

drug dealer's residence, the Fourth Circuit has admonished:

> We consistently determined that there was probable cause to support search
> warrants . . . to search suspects' residences and even temporary abodes on the basis
> of (1) evidence of the suspects' involvement in drug trafficking combined with (2)
> the reasonable suspicion (whether explicitly articulated by the applying officer or
> implicitly arrived at by the magistrate judge) that drug traffickers store drug-related
> evidence in their homes.

*United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008) (reversing district court's

order suppressing evidence seized from drug dealers' residences).

Without retreading the entire background of the investigation, the Bristolwood

Court affidavit provided the following core facts:

- Smothers, Taeyan, and one of Taeyan's family members were involved in
  the distribution of marijuana and cocaine, and Smothers had a storage facility
  in Maryland that he maintained as a stash location.

- Smothers travelled to Maryland on April 5, 2018, and was scheduled to meet
  with Taeyan and Taeyan's family member the next day.

- Smothers disappeared on April 6, 2018, and over the next six days, his
  storage locker was accessed three times by someone driving a Nissan Altima,
  the lock to the unit was removed, and the contents of the unit were stolen.

- Within hours of Smothers's meeting with Taeyan and his family member,
  two individuals (neither of whom was Smothers) disposed of Smothers's Kia
  in a particular Baltimore parking lot, cleaning the interior of the Kia before
  departing in the exact Altima Williams rented from Enterprise.

- Database records showed that Williams and Taeyan lived at the Bristolwood
  Court property and that the nominal owner of the property lived at another
  address.

- Williams registered numerous vehicles to the Bristolwood Court property.

- While conducting surveillance, officers observed a Porsche registered to Williams parked on the Bristolwood Court property.

- Investigators recovered Smothers's Kia, and inside the vehicle found a significant amount of blood (including a large pool of blood that was consistent with the "size and shape of a human body"), along with cleaning solution evincing the fact that the individuals responsible for Smothers's disappearance attempted to sterilize the car.

- Taeyan falsely reported to a private investigator that he did not know Smothers.

- Smothers's phone last pinged off Williams's property on Bristolwood Court before going dead on the exact day Smothers permanently disappeared.

- Between April 6, 2018 and when the warrant was issued, there had been no sign that Smothers was alive—no sightings, no digital footprint, no telephone activity, no bank activity, and no contact with friends or family.

- An associate of Smothers believed that Smothers might have been staying at Taeyan's residence, which according to database records was Bristolwood Court.[14]

The affidavit therefore showed that Williams resided at Bristolwood Court, that Smothers, Taeyan, and Williams were in a drug conspiracy, that Smothers went to Bristolwood Court to meet with Taeyan and Williams the day he disappeared, that Smothers was likely murdered at Bristolwood Court, that Williams disposed of Smothers's car in Baltimore using a particular Nissan Altima, that Williams burglarized Smothers's

---

[14] Williams omits truly critical facts from his motion to suppress. For example, on Page 7 of the motion, Williams states that according to the affidavit, Carl Williams ("Carl") owned Bristolwood Court, and that a database of unknown reliability placed Williams at that address. Williams neglects to mention that Williams had several cars registered to Bristolwood Court, that officers conducting surveillance saw Williams's Porsche parked on Bristolwood Court, and that there was evidence indicating that Carl in fact lived at a separate residence.

storage unit using the same Altima, that Williams registered his vehicles to Bristolwood Court (and at least with respect to the Porsche, kept his vehicles parked at Bristolwood Court), and that Taeyan falsely denied knowing Smothers.

The affidavit further drew on the training, experience, and specialized knowledge of the affiant, who synthesized a complex universe of evidence to arrive at the reasonable conclusion that evidence of the drug conspiracy and murder would be found at Williams's residence. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts should make reasonable suspicion determinations, we have said repeatedly that they must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.") (internal citations omitted); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) ("The nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."). The evidence—both direct and circumstances—articulated in the affidavit undoubtedly provided Judge Pearson with an appropriate basis to sign the Bristolwood Court search warrant.

Finally, even had the affidavit failed to establish probable cause, there would be no suppression unless the affiant lacked good faith. *United States v. Lalor*, 996 F.2d 1578,

1583 (4th Cir. 1993); *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("The question in this case is not whether the magistrate erred in believing there was sufficient probable cause to support the scope of the warrant he issued. It is instead whether the magistrate so obviously erred that any reasonable officer would have recognized the error.").[15] The Bristolwood Court affidavit was not the type of "bare bones" document—reflecting a superficial investigation—that fails the *Leon* test for good faith. *Cf. United States v. Wilhelm*, 80 F.3d 116, 121-22 (4th Cir. 1996).[16]

### B.    Williams's Statements

The government can introduce a defendant's statements that were made in response to custodial interrogation so long as the defendant waived his *Miranda* rights. A valid *Miranda* waiver must be knowing, intelligent, and voluntary. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). In determining whether a waiver was valid, the Court considers the totality of the circumstances. *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). Unless

---

[15] Though *Messerschmidt* is a Section 1983 case, the Supreme Court has applied the same test for both good faith and qualified immunity. *Id.* at 547 n.1 ("*Leon* involved the proper application of the exclusionary rule to remedy a Fourth Amendment violation, we have held that 'the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer' who obtained or relied on an allegedly invalid warrant.").

[16] The affiant's federal affidavit goes into more detail than the Bristolwood Court affidavit. Ex. 1. Though not necessary, this Court "may properly look beyond the facts stated in the affidavit and consider uncontroverted facts known to the officers but inadvertently not disclosed to the magistrate." *United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011). In other words, in assessing good faith, the Court can consider the substantial evidence described in the federal affidavit that—for reasons related to local search warrant practice—wasn't recounted with such granularity in the Bristolwood Court affidavit.

the defendant unambiguously invokes his *Miranda* rights, he waives those rights. *Berguis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010) (right to remain silent); *Davis v. United States*, 512 U.S. 452 (1994) (right to counsel).[17]

A defendant's confession is involuntary "if his will was overborne and his capacity for self-determination critically impaired." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). The Supreme Court has adopted a "totality of the circumstances" test for measuring the voluntariness of a confession. *Arizona v. Fulminante*, 499 U.S. 279, 286 (1991). The Court evaluates "both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000). Factors the Court considers include the length of questioning, the use of psychological or physical threats, the youth of the accused, the defendant's intelligence, and whether the defendant is mentally impaired. *Reck v. Pate*, 367 U.S. 433, 440 (1961).

The Supreme Court has also held that "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (internal quotation marks omitted). Thus, the Court in *Connelly* held that in order for the Court to suppress statements under the Due Process Clause, there must be

---

[17] In *Thompkins*, the defendant—who was suspected in a fatal shooting—was largely silent during his three hour interrogation. Near the end of the interview, the defendant answered "yes" when asked if he prayed to God to forgive him for the killing. The Supreme Court held that the defendant waived his right to remain silent when he uttered the word "yes," holding that the law presumes "that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afforded." *Id.* at 2262.

a "link between coercive activity of the state, on the one hand, and a resulting confession by a defendant, on the other." *Id.* at 165; *United States v. Elie*, 111 F.3d 1135, 1143-44 (4th Cir. 1997).

The Court's resolution of Williams's motion to suppress statements involves a straight forward application of *Miranda* and the law of voluntariness.[18] Regarding the former, before making incriminating statements, Williams was read and waived his *Miranda* rights, then failed to unambiguously invoke his right to remain silent or to an attorney at any point during the interview. Williams therefore has no basis to argue that his *Miranda* rights were violated.

Nor can Williams argue that his *Miranda* waiver or statements were involuntary. With respect to the characteristics of the accused, Williams—who was 42 years old at the time of the interview—did not suffer from any notable mental impairments. And at no point during the interview did Williams appear to be physically or mentally suffering, particularly to a degree indicating that his free will was overborne.

Further, Williams has been arrested at least nine times, making him an expert in navigating the criminal justice system. *Poyner v. Murray*, 964 F.2d 1404, 1413 (4th Cir. 1992) ("The determination of whether a waiver was knowing and intelligent requires an examination of the totality of the circumstances surrounding the interrogation, including . . . familiarity with the criminal justice system.") (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995) ("Although Correll

---

[18] The audio of Williams's interview is attached as Exhibit 15.

possessed an I.Q. of only 68, he was 24 years old and had had numerous experiences with law enforcement and *Miranda* warnings; the trial court characterized Correll as streetwise.").

With respect to the circumstances of the interview, the officers did not subject Williams to "any form of physical coercion or deprivation," *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995), and asked Williams open ended questions, rather than leading Williams into a confession. *Cf. United States v. Haswood*, 350 F.3d 1024 (9th Cir. 2003) (holding defendant's statements voluntary even though agent confronted defendant with newspaper article about similar sexual abuse case, subjected defendant to polygraph examination, accused defendant of lying, interrogated defendant for a full day, and "influenced the verbiage in [the defendant's] written statement").[19]

Finally, the officers limited the interview to approximately 30 minutes, interviewed Williams during the day, and used a conversational tone with Williams throughout the interview. *United States v. Nichols*, 438 F.3d 437, 443-44 (4th Cir. 2006) (finding no coercion where officers used "conversational" tone during four hour interview); *cf. United*

---

[19] Williams argues that he "was induced to confess to possession of the drugs and guns by threats to charge his family members with said possession." This is a misstatement of fact. Approximately 9 minutes and 50 second into the interview, the detective advised Williams that the officers located drugs and firearms in Williams's residence. Williams initially denied knowledge of the contraband. The detective then asked who stayed at Bristolwood Court other than Williams. Insofar as Williams's house was riddled with drugs and guns, the detective was at most rationally implying that someone who lived at the house owned the contraband, and the only people who lived at Bristolwood Court were Williams, Chaplin, and minor children. At no time did the detective threaten Chaplin with prosecution unless Williams admitted to owning the drugs and guns.

*States v. Byers*, 649 F.3d 197 (4th Cir. 2011) (finding no coercion where 21 year old defendant was arrested and placed in interview room where he was handcuffed to wall and questioned about a murder for 14 hours). To that end, the investigators did nothing to break Williams's free will.

Finally, Williams argues that his interview was the product of an illegal detention. However, the Supreme Court has made clear that officers executing a search warrant may reasonably detain and handcuff individuals present at the warrant site, particularly when investigating violent crime. *Muehler v. Mena*, 544 U.S. 93, 98 (2005) ("An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.") (citing *Michigan v. Summers*, 452 U.S. 692 (1981)); *accord United States v. Photogrammetric Data Services*, 259 F.3d 229, 238-40 (4th Cir. 2001) (detention and interview of employees while company was being searched did not exceed scope of search warrant or otherwise violate Fourth Amendment); *United States v. Smith, 704 F.2d 723*, 725 (4th Cir. 1983).[20]

---

[20] As a factual matter, Williams was not under arrest until the officers discovered guns and drugs in Williams's residence. In fact, when the interview began, the detective explained to Williams that he was detained, though not at that moment under arrest. *United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (noting that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest"). When officers found contraband in Williams's residence, the detective then explained to Williams that he was going to be arrested.

## CONCLUSION

The Court should deny Williams's motions.

                                           Respectfully submitted,

                                           Robert K. Hur
                                           United States Attorney

                                           /s/ Gregory Bernstein
                                           Gregory Bernstein
                                           Dana Brusca
                                           William Moomau
                                         Assistant United States Attorneys