**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PX-18-631** |
| | * | |
| **TAEYAN WILLIAMS,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |
| | ******* | |

**<u>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE</u>**

On December 18, 2019, defendant Taeyan Williams ("Williams") was charged in a superseding indictment with one count of conspiring to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Arising out of the same facts, Williams's father—Scott Williams ("Scott")—was charged with murder in furtherance of drug trafficking, possession with intent to distribute 500 grams or more of methamphetamine, and possession of a firearm in furtherance of a drug trafficking offense.

On April 3, 2020, Williams—a 25-year old detainee who proffers no health issues, who's charged with a 10-year mandatory minimum drug offense in a capital case, and who was transported to this district from a detention center in West Virginia where he was serving a felony drug and assault sentence—moved for release based on COVID-19.[1]

Williams does nothing to defeat the presumption under Section 3142(f) that he be detained, nor the overwhelming majority of opinions in this district holding that COVID-19 by itself is not a basis for relief. Given the presumption in favor detention, Williams's recent drug and assault

---

[1] The sentencing order for this case is attached as Exhibit 1. If the Court orders Williams released, the government is not sure whether Williams would be returned to West Virginia.

convictions, the evidence showing that Williams participated in a violent narcotics enterprise that committed murder to further its objectives, and Williams's complete failure to articulate a basis for release, the Court should deny this motion.

**Factual Background**

The investigation revolved around the murder of Noah Smothers ("Smothers"), who's been missing since April 6, 2018. Smothers was born in 1995 in New York. He attended Gettysburg College in Pennsylvania, but never graduated. According to Individual 1—who was Smothers's long-time friend and business partner—Smothers eventually attended the University of California Davis, where he studied agriculture and learned to cultivate marijuana. After attending the University of California Davis, Smothers returned to the East Coast.

Around that time, Smothers and Individual 1 started a relatively large marijuana operation. Individual 1 moved to Los Angeles, where he made connections with organic marijuana growers and Shipping Company 1—a company that was willing to transport large quantities of marijuana across the country. For his part, Smothers rented a unit at a storage facility in Jessup, Maryland ("the storage facility"). Individual 1 used Shipping Company 1 to transport the organic marijuana to Smothers, and Shipping Company 1 used Smothers's access pin number to enter the facility in Jessup and place the packages in Smothers's storage unit. Smothers then collected the marijuana and distributed it in wholesale quantities to college students in Maryland, West Virginia, and Pennsylvania. By all accounts, Smothers was a prolific (though non-violent) marijuana distributor.

In 2017 Smothers entered the world of poly-drug distribution and went into business with Scott and Williams. Scott was a cocaine and methamphetamine dealer from Jamaica. Williams is Scott's son, and like Smothers sold marijuana and cocaine to college students. At one point,

Smothers told Individual 1 that he trusted Scott and even stayed at Scott's house, which is located at 10301 Bristolwood Court in Laurel, Maryland ("the Bristolwood Court residence") and was likely the sight of Smothers's murder.

In March 2018, Individual 1 was seriously injured in a car accident, and for several weeks could not ship marijuana to Smothers. In early April 2018, once Individual 1 had sufficiently recovered from his injuries, he shipped approximately 100 pounds of organic marijuana worth hundreds of thousands of dollars to Smothers's storage facility. This was the largest single distribution Individual 1 ever made to Smothers. It also offered an opportunity for Scott and Williams to rob Smothers. The day after the marijuana was delivered to Smothers's storage unit, Smothers met with Scott and Williams at the Bristolwood Court property to discuss the future of their drug distribution partnership. He was never seen again.

## I.    *Smothers's Disappearance*

On April 5, 2018 at around 1:08 p.m., surveillance cameras show Shipping Company 1 enter Smothers's storage facility, and contemporaneous records show that the driver used Smothers's pin number to get into the facility. The video then shows the driver for Shipping Company 1 deliver several large boxes to Smothers's unit.[2]

Geolocation data associated with Smothers's cell phone shows that on April 5, 2018 at around 12:43 p.m., Smothers was in Pennsylvania. That day, Smothers drove to Gettysburg College where he spent time with Individual 2, a female acquaintance of Smothers. Later that day, Smothers told Individual 2 that he had a family emergency and needed to leave. Location data

---

[2] The units are equipped with sensors that indicate when the units are opened, though Smothers's unit is not actually visible from the video.

from Smothers's cell phone shows that Smothers then travelled to Maryland. From the cell phone location data, Google records, surveillance video, business records, license plate readers, witness testimony, and search warrant evidence, the government constructed the following timeline of Smothers, Williams, and Scott's activities surrounding the time of the murder.

*Noah Smothers (April 5, 2018)*

- At 5:36 p.m., surveillance video and contemporaneous records show Smothers enter the storage facility in a Kia with Ohio tag HCK-3975 ("the Kia") that Smothers rented two weeks earlier from Enterprise.[3] Smothers uses his pin number to access the facility.

- At 6:00 p.m., surveillance video from the storage facility shows Smothers struggling to move several large boxes from his unit into his car. Six minutes later, Smothers exits the facility with the boxes in his car.

- At 7:42 p.m., Smothers runs a Google search.[4]

- Around 10:00 p.m., Smothers checks into his AirBNB in Baltimore. Three hours earlier, Smothers writes to the property owner, "I apologize for not answering. There was a family emergency back at home that I had to leave town for. I will be using the bnb tonight." Cell phone location data places Smothers's cell phone in Maryland at 10:45 p.m. Four hours later, the AirBNB owner observes Smothers's car in front of the property.

*Noah Smothers (April 6, 2018)*

- At 6:49 a.m., Smothers runs the Google search "breakfast near me."

- At 7:51 a.m., surveillance video shows Smothers return to the storage facility. Smothers uses his pin number to access the facility, and the storage facility's sensors show that Smothers opened his unit.

- At 11:20 a.m., cell phone location data places Smothers's cell phone in Baltimore.

---

[3] Smothers rented the vehicle on March 20, 2018.

[4] The Google searches are coded with locations. Thus, the Google searches on Smothers's phone indicated where Smothers was located at the time.

- At 12:00 p.m., Smothers checks out of the AirBNB.

- At 12:54 p.m., Smothers runs a Google search. At the time, Smothers is on or near the Baltimore Parkway near Scott's residence, *i.e.*, the Bristolwood Court property.

- At 1:32 p.m., Smothers runs his last known Google search. At the time, Smothers is 1.4 miles from Scott's residence.

- At 1:52 p.m., Smothers writes a note to his AOL account. The subject of the note was "Tae gave 5900 plus 4 wgs," and the note appears to be a ledger showing drugs Smothers sold Williams and the money Williams owed Smothers.

- At 2:03 p.m., cell phone location data shows Smothers's cell phone hitting off a cell tower 2.8 miles from Scott's property (the Bristolwood Court residence). One hour and nine minutes later, Smothers's phone hits off a different cell tower 1.4 miles from Scott's property. The arches of the two towers intersect within feet of Scott's property, indicating that Smothers's phone was located on or near Scott's property when it went dead.

- At 3:12 p.m., Smothers's outgoing phone activity completely stops. Smothers was never seen again.

*Taeyan Williams (April 6 and 7, 2018)*

- Records associated with Williams's phone show that he was at Scott's residence from 6:13 a.m. to 1:37 p.m., when he travelled away from the Bristolwood Court property.

- At 4:04 p.m., Williams texted a University of Maryland campus drug dealer, "I got your pens" (referring to THC vape pens). In addition to cocaine and marijuana, Smothers sold THC pens.

- At 7:17 p.m., Williams enters a note into his phone with the address to Smothers's storage facility.

- At 3:57 a.m. the next morning (April 7, 2018), Williams enters another note into his phone, this time the login information for Smothers's encrypted cell phone account.

*Scott Williams (April 6 and 7, 2018)*

- On April 6, 2018, phone records show that Scott was at his Bristolwood Court property until 4:56 p.m., when Scott's phone was turned off.

- On April 7, 2018 around 2 p.m., Scott's phone turns on again after being off for close to 21 hours.

## II.    *Smothers's Kia and Storage Unit*

The evidence shows that after Smothers's phone shut off, Scott disposed of Smothers's car and burglarized Smothers's storage unit. On April 6, 2018 (the day Smothers went missing) at 8:37 p.m., a Nissan Altima ("the Altima") Scott rented arrived at the entrance of the storage facility and the driver used Smothers's pin to get through the front gate. The Altima exited the facility a short time later, and the sensor records show that no units were opened.

At least the first time he entered the storage facility using Smothers's pin, Scott likely couldn't get into Smothers's unit. In addition to the front gate, which requires a pin to open, each unit is secured with a removable lock. Scott likely got into the facility using Smothers's pin, but realized that he couldn't get into Smothers's unit. Notably, after seizing Scott's cell phone pursuant to a search warrant on June 6, 2018, investigators found a deleted text message with no date or time information on Scott's phone that read "U got bolt cutters." This was one of few deleted messages on Scott's phone.

Additional evidence suggests that Scott was driving the Altima. Though the plates had been removed from the Altima, the car was the same make, model, and color as the car Scott rented from Enterprise three days earlier, which was equipped with Massachusetts tag 5XY974. Further, investigators located the Altima Scott rented after Scott returned the car to Enterprise and photographed unsecured screws on the plate, suggesting that the plate had recently been removed, consistent with the surveillance video from the storage facility depicting an Altima with missing plates.

In the early morning hours of April 7, 2018, video surveillance from the lot of Apartment Complex 1 in Baltimore shows two subjects disposing of Smothers's Kia. Specifically, at 4:38 a.m., one of those subjects drives Smothers's Kia into the lot followed closely by a Nissan Altima. A license plate reader at the entrance to the lot captured the Altima's tag—Massachusetts tag 5XY-974—that matched the Altima that Scott rented from Enterprise on April 3, 2018. The video shows one of the subjects clean the interior of Smothers's Kia, then get into Scott's Altima before the two drive away.

On April 7, 2018 at 9:04 p.m., the Altima again drove to the entrance of the storage facility and entered Smothers's pin. Though the driver entered the correct pin, the gate didn't open because the facility closed at 9:00 p.m., and the Altima departed.

On April 8 at 11:13 a.m., Scott accessed his own storage locker at Cube Smart. Investigators who executed a search warrant on the unit found tools and car parts, evidence that when combined with the deleted bolt cutters text message, suggests that Scott went to his storage unit to get something to use on Smothers's removable lock at the storage facility. Nine hours after Scott went to Cube Smart, the Altima returned to the storage facility, and the driver again used Smothers's pin to get through the front gate. After the Altima entered the facility, the sensor on Smothers's storage unit was triggered. Surveillance video shows the Altima leaving shortly thereafter.

On April 11, 2018, Individual 3—an employee at the storage facility—noticed that Smothers's unit was unsecured and took photographs. The photographs show that the lock had been removed and that the contents of the boxes in the unit were gone. Individual 3 tried calling Smothers, but her calls went to voicemail. Around that time, Smothers's parents reported their son

missing to investigators. Smothers's friends and family told investigators that they had frequent contact with Smothers, and that if Smothers were alive, it would be extremely unlikely for him to go a significant period of time without contact.

To that end, the evidence shows that in early April 2018, Individual 1 shipped an extremely large quantity of marijuana to Smothers at the storage facility in Jessup. On April 6, 2018, Smothers went from the storage facility to Scott's residence on Bristolwood Court, where his phone went dead and from where he disappeared. Contemporaneously, Scott turned off his phone. In the early morning hours of April 7, 2018, a surveillance camera and license plate reader captured two individuals—one of whom was inferentially Scott and who was driving his own car—and the other of whom was driving Smothers's Kia, get rid of Smothers's Kia in the parking lot of Apartment Complex 1.

Between April 6 and 8, 2018, the Altima Scott rented went to Smothers's storage unit three times. After the third attempt to get into Smothers's storage unit, the unit was burglarized, and its contents—a valuable cache of marijuana Individual 1 shipped to Smothers—was stolen. Investigators recovered the Kia several weeks later.

### III.   *Recovery of Smothers's Kia*

On April 26, 2018, Enterprise recovered the Kia from the parking lot of Apartment Complex 1. Government forensic analysts tested the Kia and found that it was essentially covered in blood, despite what appeared to be efforts to sterilize the car of evidence. The analysts found blood on the exterior of the car (*e.g.*, on the passenger door frame and near the trunk), and a substantial amount of blood pooled in the trunk. For instance, a photographed luminal test shows

a pool of blood in the shape of a body in trunk of the Kia. The blood tested positive for Smothers's DNA.

## IV.   *Bristolwood Court Search Warrant*

Given the evidence that Smothers was murdered on Scott's property, that Scott burglarized Smothers's storage unit to steal Smothers's marijuana, and that Scott and an associate disposed of Smothers's Kia in Baltimore, investigators obtained a warrant to search the Bristolwood Court residence ("the search warrant").[5] On June 6, 2018, investigators executed the search warrant, where they found that Scott and Patti Ann Chaplin (Scott's girlfriend) were living in the master bedroom, and Scott's two young children were living in a separate bedroom. While executing the search warrant, investigators discovered the follows evidence:

- Three firearms in the master bedroom, including a Jennings-Bryco .380 caliber handgun, a Beretta .25 caliber handgun, and a Century Arms assault rifle.

- In the crawl space beneath Scott's staircase, a Sig Sauer 9mm handgun ("the Sig Sauer") that Scott used to murder Smothers.

- Several computers and cell phones.[6] A forensic analysis of one of the computers found in Scott's residence shows that around the time Smothers's phone went off, someone used the device to conduct numerous internet searches for the EZ Storage in Jessup (the name of Smothers's storage facility).

- Scott's Jamaican passport and other paperwork evincing Scott's residence at the Bristolwood Court address.

- A drug ledger outlining strains of marijuana, drug quantities, and the names "Tae, Me, or Team" written in the margins.

---

[5] On June 5, 2018, Circuit Court Judge Michael Pierson authorized the warrant to search the Bristolwood Court residence.

[6] The cell phones were searched pursuant to a separate search warrant.

- 33 kilograms of marijuana. By their unique labels, Individual 1 later identified marijuana packages found at Scott's residence as the packages he shipped to Smothers's storage unit, further proving Scott's identity as the individual who burglarized Smothers's storage unit.

- 2,018 pills of methamphetamine.

- 252 grams of cocaine.

- 45.5 grams of cannabis oil in vials (91 vials).

- 8.2 grams of THC in edible gummies (820 gummies). The gummies were identical to edibles Smothers sold, photographs of which Smothers posted to his Instagram profile.

- $213,573 in United States currency.

- $4,650 in counterfeit currency.

That day, investigators interviewed Scott, who waived his *Miranda* rights and voluntarily spoke with the investigators. Scott admitted that the firearms (including the Sig Sauer) and drugs located in the residence were his. Scott denied knowing Smothers by name or photograph, though Scott confirmed that other than himself, the only person who drove the Altima Scott's rented was someone named "Dennis." When asked for Dennis's phone number, Scott provided his own phone number (with the exception of one digit).[7]

Chaplin also spoke to the investigators, telling them that she lived in the residence with Scott and their children. Chaplin stated that Williams and Scott's brother sometimes stayed in the basement bedroom of the house, but that there were no other full time residents of the Bristolwood

---

[7] A conversation forensically recovered from Scott's phone shows Scott attempting to obtain a fake identification in the name of Dennis Bell.

Court property besides Chaplin, Scott, and the minor children. Chaplin—who had been in a romantic relationship with Scott for more than a decade—had never heard of Dennis Bell.

**V.**    ***The Sig Sauer***

After the search warrant, forensic analysts tested the Sig Sauer found in Scott's crawl space for the presence of blood and DNA. In the slide of the Sig Sauer, the analysts found blood. The investigators then disassembled the Sig Sauer and found more blood pooled in the frame of the firearm. The blood tested positive for Smothers's DNA. Notably, the area inside the slide and frame of the Sig Sauer would only be exposed during the brief moment after a round is discharged—when the firearm chambers a new round into the barrel. Thus, the fact that Smothers's blood was inside the slide and frame of the Sig Sauer indicates that the firearm was used to murder Smothers's at close range, and that Smothers's blood splattered into the frame and slide as the next round chambered.

**VI.**    ***Interview with Williams***

After the search warrant, the investigators interviewed Williams, who stated that he had a business relationship with Smothers, and that in general he sold cocaine and ecstasy to Smothers in exchange for marijuana. Williams added that the last time he saw Smothers was the day of Smothers's disappearance, and that at the time, Smothers was alone with Scott at the Bristolwood Court property. According to Williams, when he returned to the Bristolwood Court property, Smothers was no longer there, and he never heard from or saw Smothers again. When one of the detectives asked Williams if Smothers deserved what happened, Williams responded, "he should've moved smarter man. He was greedy . . . but no, he wasn't a bad guy."

## VII.   *Williams's Drug Associates*

During the investigation, the government interviewed several witnesses who told the investigators that they were street level drug dealers, and that they purchased wholesale quantities of marijuana and cocaine from Williams. For one example, Individual 2—a good friend of Smothers who introduced Smothers to Williams (and by extension Scott)—recalled that Williams and his family owed Smothers upwards of $50,000, that Smothers was going to stop supplying marijuana to Williams until the debt was paid, and that the last time he saw Smothers alive, Smothers said that he was going to Maryland to meet with Williams and his family about the debt.

## Department of Corrections Response to COVID-19

The Department of Corrections ("the DOC") is taking substantial steps to mitigate the effect of COVID-19. As additional measures are implemented, the DOC is alerting the public to the precautions.[8] In addition to the information on the public website, the government has learned the following by communicating with the United States Marshals Service ("USMS") and the DOC's General Counsel.

the DOC has installed an "Incident Command System." Each day, the supervisors of the DOC and relevant agencies meet to discuss COVID-19 issues as they pertain to the DC jails, to discuss strategies to combat any possible spread of COVID through the DC jails, to track national trends, and to make sure the DOC's policies are consistent with those national trends and with recommendations from the Centers for Disease Control and the DC Department of Health. The DOC also has taken various steps to protect its facilities, to screen visitors and incoming detainees

---

[8] https://doc.dc.gov/page/coronavirus-prevention

12

at intake, to maintain cleanliness within the facilities, and to increase its medical coverage within

facilities, including:

- **No Non-Legal Visitation:** As of March 14, 2020, the DOC suspended all non-attorney in-person visits, programming, and volunteer activities, and has enhanced cleaning efforts, especially within common areas. For staff and legal visitors, the DOC performs a COVID-19 screening for these limited visitors. The screening includes asking a series of questions to determine possible exposure to COVID, observing whether the person is displaying flu-like or COVID-associated symptoms, and taking their temperature. Anyone displaying symptoms, giving a positive response, or showing an elevated temperature, is denied entry into the facility.

- **Inmate Screening and Awareness:** All new detainees and inmates are subject to similar COVID-19 screening. If an inmate presents with symptoms or provides affirmative answers during screening, they are provided a face mask and taken to medical. Medical does an assessment and makes determination about whether transport to the hospital is appropriate. Furthermore, facility staff are going through the jail units and reminding detainees to put in requests to meet with medical staff if they are feeling poorly. Staff are reminded at roll calls about the need for various preventative measures.

- **Quarantine:** Particular units have been set up to operate as quarantine locations. Detainees are placed in quarantine locations if they show flu-like or COVID-like symptoms.

- **Extra Cleaning:** Additional measures have been taken to maintain cleanliness of facilities, detainee hygiene, and access to (and awareness of) medical treatment. The DOC has increased its supply of cleaning and sanitation materials. They currently have 55,000 bars of soap and are issuing inmates one bar of soap each week, in addition to allowing additional purchases of soap through commissary. Posters are placed throughout the facilities to remind detainees about preventative measures they can take. The DOC staff puts emphasis on maintaining clean surfaces, avoiding touching, and other similar precautions. In addition to standard cleaning, staff perform cleaning spot checks every two hours. A cleaning unit goes through areas common areas to clean frequently touched areas like elevator buttons, escalators, and railings.

As of March 27, 2020, at 4:30 p.m., the DOC has implemented additional measures to

mitigate the possible spread of COVID-19 by modifying the movement of detainees and inmates

as follows:

- **Cancellation of Certain Activities:** Off-unit religious services have been cancelled, off-unit activities have been halted, and barbering and cosmetology services have been suspended at this time.
- **Reduction of Out-of-Cell Time**: Modified recreation will include a reduction in out-of-cell time (minimum of 2.5 hours daily) to reduce the number of social contacts.

### Argument

Under Section 3142(f)(1)(C), because Williams is charged with conspiracy to distribute 500 grams or more of methamphetamine, the law presumes that Williams is a danger to the community and flight risk. Far from overcoming this presumption, Williams—who only last year was convicted of felony drug and assault charges—asserts that "Mr. Smith" has ties to the community, though doesn't explain who Mr. Smith is or whether Williams has ties to the community of his own. Williams then proffers that he found a potential custodian, but again, doesn't say who the custodian is or whether Pretrial Services has vetted and approved that custodian. As both a legal and factual matter, Williams entirely ignores the statutory presumption that he be detained.

Rather than addressing the presumption, his own recent criminal history, or the overwhelming evidence of his guilt to a charge that exposes Williams to a 10-year mandatory minimum term of imprisonment, Williams relies entirely on COVID-19. However, this Court and the United States District Court for the District of Columbia have overwhelmingly denied motions for release based solely on COVID-19, and Williams gives this Court no reason to depart from those opinions. *E.g.*, *United States v. Hoffman*, PX-18-196, ECF No. 92 at 3 n.1 (Order by Judge Sullivan) (accepting the defendant's "argument would mean that every inmate at D.C. Jail (or at least most of them) should be released because of the exceptional circumstances presented by the COVID-19 pandemic. The Court rejects this"); *United States v. Gray*, GJH-19-0407 (D. Md.),

ECF 120 (Order by Judge Hazel) ("[T]hese concerns alone are insufficient to trigger the release of an individual who this Court has determined poses a threat to the safety of the community, particularly given proffers by the Government that the correctional and medical staff within the Department of Corrections . . . are implementing comprehensive precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus . . . and, additionally, that they are equipped to handle Mr. Gray's medical needs.").[9]

If Williams were particularly vulnerable to the virus, he would have a better argument. But again, Williams is 25 years old. He does not proffer a single health issue. In comparison, this Court has recently denied motions involving detainees with serious medical conditions. *Martin*, PWG-19-140 (Order by Judge Grimm) (denying motion for pretrial release by detainee suffering from "diabetes, high blood pressure, asthma, and pain"); *Bilbrough*, TDC-20-33 (Order by Magistrate Judge Sullivan) (denying a similar motion by a defendant suffering from diabetes, even though "experts on COVID-19 have stated that individuals with diabetes are at a higher risk of experiencing more serious complications if infected with the virus"); *Parker*, TDC-18-344 (Order by Magistrate Judge Simms) (denying motion for pretrial release by a detainee who "suffered an

---

[9] Related opinions include *United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209 (Order by Judge Grimm); *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Order by Magistrate Judge Sullivan); *United States v. Parker*, TDC-18-344 (D. Md.), ECF No. 478 (Order by Magistrate Judge Simms); *United States v. Jefferson*, CCB-19-487 (D. Md.), ECF No. 25 (Order by Judge Blake); *United States v. Scott*, PWG-13-544 (D. Md.), ECF No. 94 (Order by Magistrate Judge Day); *United States v. Rivas*, TDC-19-417 (D. Md.), ECF No. 72 (Order by Magistrate Judge Sullivan); *United States v. Chriscoe*, TDC-20-46 (D. Md.), ECF No. 131 (Order by Magistrate Judge Coulson); *United States v. Beamon*, PX-19-570 (D. Md.), ECF No. 37 (Order by Judge Xinis); *United States v. Gibson-Bey*, RDB-19-563 (D. Md.), ECF No. 26 (Order by Magistrate Judge Coulson); *United States v. Hill*, APM-19-260 (D.D.C.), Minute Order (Mar. 19, 2020); *United States v. Gibson-Bey*, RDB-19-563 (D. Md.), ECF 26 (Order by Magistrate Judge Coulson); *United States v. Scott*, PWG-19-0008 (D. Md.), ECF 66 (Order by Magistrate Judge Day).

aneurysm (in the past), had prostate cancer (now in remission), and presently suffers from diabetes, the latter two conditions having compromised his immune system and/or put him at a higher risk of an inability to fight infection"); *Jefferson*, CCB-19-487 (Order by Judge Blake) (asthma); *Williams*, PWG-13-544 (Order by Magistrate Judge Day) (67-year-old defendant); *Gray*, GJH-19-407 (Order by Judge Hazel) (denying relief for a defendant alleging "that he had open heart surgery as a child, requires regular EKGs, and continues to experience a diminished immune system, heart flutters, and shortness of breath").

Considering the statutory presumption in favor of detention, Williams's recent criminal history that includes felony drug and assault convictions, the weight of the evidence against Williams, the chorus of judges in this district who have denied release motions based solely on COVID-19, and Williams failure to support his request that he be released, the Court should deny this motion.

## Conclusion

The government respectfully requests that the Court deny Williams's motion for release.

Respectfully submitted,

Robert K. Hur
United States Attorney

/s/ Gregory Bernstein
Gregory Bernstein
William Moomau
Assistant United States Attorneys

16