IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. PX-18-631 |
| | * | |
| SCOTT ANTHONY WILLIAMS, and | * | |
| TAEYAN RAYMOND WILLIAMS | * | |
| | * | |
| Defendants. | * | |

*******

**GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO
SCOTT WILLIAMS'S MOTION TO SUPPRESS STATEMENT**

**I.    FACTUAL BACKGROUND**

Defendant Scott Williams previously filed a Motion to Suppress Tangible Items and Statements. (ECF 16.) The Government opposed the motion in a lengthy memorandum and accompanying exhibits. (ECF 43). The Government now supplements its response[1] to address statements made by the Defendant before he was advised of his *Miranda* rights during an audio-recorded interview with law enforcement conducted on June 6, 2018—the same date that the Defendant's home was searched pursuant to search warrant. The audio recording has been submitted as Government's Exhibit 15.[2]

---

[1] The government hereby incorporates and repeats all representations, contentions, and arguments in its original opposition to Scott Williams's motions to suppress.

[2] The Defendant, Scott Williams, is advised of his *Miranda* rights approximately one minute and fifty seconds into the audio recording filed as Exhibit 15.

1

The following is the pre-*Miranda* colloquy that took place between the Defendant Scott Williams ("SW") and two representatives of the Maryland State Police, Det. Sgt. John Monarek ("JM")[3] and Cpl. Kyle Simms ("KS"). [4]

| | | |
|---|---|---|
| | JM | This is Corporal Simms. I'm Sergeant Monarek. I work auto theft, alright? Yeah. You have a car business, right? |
| | SW | Yeah. |
| | JM | You've been selling, buying and selling cars? |
| | SW | Yeah. |
| | JM | Any of those cars ever been stolen that you know of? |
| | SW | No. |
| | JM | OK.  That's some of the questions we have.  Alright? |
| | SW | OK. |
| | JM | So, Cpl. Simms is going to talk to you about that. |
| | SW | OK. |
| | JM | . . . That's mainly what I do is auto theft. |
| | SW | OK. |
| | JM | Alright.  The uh.  You own the Porsches, right? |
| | SW | Yeah. |
| | JM | What about the white car in the driveway? |
| | SW | That's a rental car. |
| | JM | OK. Did you have a rental car before that? |
| | SW | Huh? |
| | JM | Did you have a Nissan rental car before that? |
| | SW | That's a Nissan rental car. |
| | JM | OK. |
| | KS | This one right here…? |
| | JM | What about the? Oh, I see the Nissan is there and what's the other car, the white uh Volkswagen? |

---

[3] Det. Sgt. Monarek is also referred to below as Sgt. Monarek.
[4] The transcription that appears in this pleading was prepared by Government counsel and should be considered a best effort draft transcription while a formal transcript is prepared.

2

| SW | That's my brother's car. He rented it from Budget. |
|---|---|
| JM | Whose car? |
| SW | My brother. He rented it from Budget. |
| JM | That's your brother over there? |
| SW | Yeah. |
| JM | OK. OK. And did, you had another Nissan before that, correct? |
| SW | I have another Nissan before this? No. |
| JM | Yeah you did. It was another, you rented it from Enterprise. |
| SW | Which one? |
| JM | It was another gray Nissan with Massachusetts tags. |
| SW | With Massachusetts tags. Uh, Yeah. |
| JM | Yeah. You were the renter of that, right? |
| SW | I rented it before, but I turned it in. |
| JM | Ok. No, I know, but I'm just trying to keep things straight with all these rental cars. Were you the only one that drove that car? |
| SW | What the Massachusetts? |
| JM | Yeah. |
| SW | No. |
| JM | You were the only one on the rental agreement. |
| SW | Yeah |
| JM | Who else would have been driving that car? |
| SW | Hmm. My buddy borrowed it, borrowed it and that's about it. |
| JM | Ok well, we'll talk to you about that in a second. |
| **01:50 Questions ended and defendant advised of rights by Corporal Simms** ||

The Government agrees that the Defendant was briefly subject to custodial interrogation about various vehicles before he was advised of his *Miranda* rights. Under the circumstances, however, the Defendant's pre-*Miranda* and post-*Miranda* statements during the interview were voluntary, and the post-*Miranda* statements were made after he knowingly, intelligently, and voluntarily waived his rights.

## II.     DEFENDANT'S POST-*MIRANDA* STATATEMENTS ARE ADMISSIBLE

A leading Fourth Circuit case on this issue is *United States v. Mashburn*, 406 F.3d 303 (4th Cir. 2005).  In *Mashburn*, the defendant was arrested outside of his residence and had a firearm and methamphetamine in his possession.  The defendant was secured outside of his home while agents executed a search warrant.  The defendant, in handcuffs, was taken into the home and seated on a couch.  The agents then told the defendant "the only way that [he could] actually help [himself] in a federal system is, number one, by acceptance of responsibility, and number two is substantial assistance." *Id.* at 305. The agents then asked the defendant two to three questions, to which the defendant responded.  When the agents realized they had not advised the defendant of his rights, they obtained a waiver-of-rights form and informed the defendant of his *Miranda* rights.  After the defendant waived his rights, questioning resumed.  In covering the defendant's answers to the pre-warning questions, the agents asked leading questions to which the defendant responded "yes" or "no."  Afterwards, during the post-warning interview, the defendant gave more extensive information about his involvement in drug trafficking.  *Id.*

The issue presented to the Fourth Circuit in *Mashburn*, as in the case at hand, was whether a defendant's initial, unwarned statements rendered involuntary the statements made after a receiving and waiving of *Miranda* rights.  *Id.* at 307.  In reaching its decision, the Fourth Circuit in *Mashburn* examined the United States Supreme Court cases of *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285 (1985) and *Missouri v. Siebert*, 542 U.S. 600, 124 S. Ct. 2601 (2004).  After a thorough analysis of both cases, the Fourth Circuit held that if a question first strategy by law enforcement is "deliberately employed, postwarning statements related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statements are made." *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2011).

4

"'[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion' as to any subsequent, postwarning statement. *Elstad,* 470 U.S. at 314, 105 S.Ct. 1285. Rather, '[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made.'" *Id.* Because there was no evidence that the agents intentionally or deliberately delayed administering *Miranda* warnings, the Court found the "admissibility of Mashburn's statements [wa]s governed by *Elstad.*" *Id.*

Thus, following *Mashburn*, in evaluating the admissibility of Defendant Scott Williams's post-*Miranda* statements, the issues for the Court are (i) whether the interviewing officers deliberately failed to advise the Defendant of his rights, and (ii) following the *Miranda* advisement, whether the Defendant's statements were voluntarily made.[5] The evidence in this case will show that—as in *Mashburn*—the interviewing officers here had no deliberate plan to withhold *Miranda* warnings and employed no coercive tactics prior to advising the Defendant of his rights. The evidence will further establish that the Defendant's post-*Miranda* statements were voluntary. Consequently, as in *Mashburn*, the Defendant's post-*Miranda* statements should be held admissible against him at trial.

      **a.**      **The Officers did not deliberately withhold administering *Miranda* warnings to Defendant Scott Williams**

As the interviewing officers are expected to explain, the front door of the Defendant's residence was forcefully removed and the Defendant and others exited the house. While outside the residence, the Defendant received a medical assessment. Sgt. Monarek of the Maryland State Police was present at the time and observed the Defendant visibly upset outside of the home. At

---

[5] In accordance with *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285 (1985), the Government agrees that the Defendant's pre-*Miranda* answers to the questions posed should be excluded from use during the Government's case in chief at trial.

the time, Sgt. Monarek was wearing a mechanic-style shirt. Sgt. Monarek overheard the Defendant say to a female believed to be the Defendant's wife, in substance, "it's the auto theft police." In order to avoid escalating the tension, when Sgt. Monarek conversed with the Defendant, he said he worked in the auto theft unit and limited his questioning to vehicles—specifically, vehicles observed at the residence at the time of the search, and a vehicle that Sgt. Monarek already knew from Enterprise records that the Defendant had rented. This quick decision by Sgt. Monarek was not made with any bad faith or with the intent to gain any tactical advantage during the later questioning that was to be conducted by Cpl. Simms. Rather, it was an effort to diffuse what appeared to be an escalating situation. And, as the facts of the interview show, there was no detrimental effect upon the Defendant or his post-*Miranda* answers.

Consequently, the Government agrees that the Defendant's pre-*Miranda* statements should be excluded from the Government's case-in-chief; however, the absence of any deliberate plan to withhold *Miranda* and the absence of any conduct "calculated to break the suspect's will," *Elstad*, 470 U.S. at 1296, establishes that there is no basis to attribute the technical *Miranda* violation to the Defendant's post-*Miranda* statements, which were otherwise voluntarily made.

    **b.**    **Defendant's post-*Miranda* statements were voluntary**

"The test for determining whether a statement is voluntary under the Due Process Clause is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997).

After speaking with Sgt. Monarek for approximately one minute and fifty seconds, the Defendant was advised of his rights by Cpl. Simms. There is no evidence or contention that the Defendant did not understand his rights as informed by Cpl. Simms, or that Cpl. Simms did not

6

properly inform the Defendant of his rights.  After being advised of his rights, the Defendant voluntarily and intelligently waived them and agreed to answer the officers' questions.  (*See* Government's Exhibit 15, 1:54-3:48 and Government's Exhibit 14).

The defense may argue that the Defendant felt compelled to answer questions after the administering of the *Miranda* warnings because he had already briefly talked to the officers about vehicles in front of his home.  The Supreme Court in *Elstad*, however, dismissed this contention. In *Elstad*, the Supreme Court held that "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.  We find that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief.  No further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver.  We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Oregon v. Elstad*, 470 U.S. 298, 318, 105 S.Ct. 1285, 1298 (1985).  *See also United States v. Dorsey*, 744 F. App'x 130, 134 (4th Cir. 2018) ("Without a showing of the officer's subterfuge, the mere fact that Dorsey made pre-*Miranda* statements and post-*Miranda* statements does not render his post-*Miranda* statements involuntary and inadmissible."); *United States v. Hill*, 340 F. App'x 950, 952 n.3 (4th Cir. 2009) ("Hill's assertions to the contrary, the mere fact that Hill's post-*Miranda* statements confirmed his pre-

*Miranda* admissions does not, in and of itself, render the post-*Miranda* statements involuntary and inadmissible.").

During the post-*Miranda* portion of the interview, there were no threats, promises or improper inducements made to the Defendant by Cpl. Simms. To the contrary, Cpl. Simms, while persistent in his questioning, was very cordial and respectful to the Defendant during the interview, and in addition to asking questions, also answered questions posed to him by the Defendant. Furthermore, the Defendant was familiar with his *Miranda* rights as he had been arrested and advised of his rights before. (Government's Exhibit 15 at 2:07-2:14). Additionally, although the Defendant was asked questions by Simms post-*Miranda* about the Massachusetts rental car, the Defendant did not confess to any crime in relation to the rental car, and consistently said that he had lent the car to a friend, as he had said pre-*Miranda*.

The post-*Miranda* interview lasted approximately 44 minutes. Other subjects inquired about by Cpl. Simms included controlled substances and firearms found in the Defendant's home; other persons at the home; the Defendant's son, Taeyan Williams; travels to Baltimore; his use of storage units; his knowledge of Noah Smothers; and, the murder of Noah Smothers. At a minimum, the Defendant was evasive during the interview. For example, the Defendant claimed that Taeyan Williams, his son, was his cousin, and that he did not know where his son stayed. (Government's Exhibit 15, 8:20-9:50). He denied knowledge of and ownership of the guns and drugs. (Government's Exhibit 15, 10:10-10:15). He also denied knowledge of the male who was at his residence when the search warrant was executed. (Government's Exhibit 15, 11:38-12:42). After his denial about the guns and drugs, Simms asked the Defendant if he was saying that the controlled substances and guns were his wife's. In response, the Defendant took responsibility for those items. (Government's Exhibit 15, 12:45-13:00). The Defendant's admission as to the

8

contraband items, was the result of Simms questioning, not in response to any improper threat or coercion made by Simms involving the arrest of the Defendant's wife. The Defendant was also shown a picture of Noah Smothers and denied any knowledge of Smothers. (Government's Exhibit 15, 18:34-18:47.)

The post-*Miranda* statements made by the Defendant in response to Cpl. Simms questions were made after the Defendant had been advised of his rights, indicated that he understood his rights, and that he agreed to answer Cpl. Simms's questions. There were no coercive actions, threats, or improper inducements by Simms; rather, the Defendant—with full knowledge and understanding of his rights—was motivated by his desire to appear cooperative and at the same time mislead law enforcement by his false representations and half-truths, in hope of escaping arrest and prosecution. In addition to knowingly and intelligently waiving his *Miranda* rights, the Defendant's statements were voluntary and are admissible as part of the Government's case in chief.

    **c.**     **There is no Common Substance between the Defendant's Unwarned Statements and His Post *Miranda* Interview**

All cases on this subject examined by Government counsel involved situations where the prewarning interview resulted in a confession, that was repeated in the postwarning interview. This case differs substantially in that regard because the Defendant did not confess to any crime prewarning or postwarning. The Defendant admitted to owning, using or renting various cars, which was information law enforcement already knew.

In *Missouri v. Siebert*, 542 U.S. 600, 124 S.Ct. 2601 (2004), the United States Supreme Court examined a police custodial interview where the reading of *Miranda* rights was found to be deliberately withheld, which the Court described as "a police strategy adapted to undermine the *Miranda* warnings." *Id.* at 616. In discussing the police tactics, the Court explained the interview

9

procedure in the following manner: "(t)he unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid." *Id.*

The questioning here falls nowhere near the scenario examined in *Siebert*. Here, although there was brief questioning prior to the administering of the *Miranda* warnings, it was not part of any improper police strategy. Further, the brief questioning that took place before the *Miranda* warnings did not result in a confession to any crime, and only related to automobiles owned, used, or rented by the Defendant. The post-*Miranda* interview covered numerous subjects outside of the "substance" of the pre-*Miranda* questions. *See Mashburn* at 309. In *Mashburn*, while considering the decision in *Seibert*, the Fourth Circuit held that if a "two-step" approach is deliberately employed, "postwarning statements related to the substance of prewarning statements must be excluded unless curative measures are taken." *Id.*

Factually, from the audio-recorded interview, there is nothing to indicate that the manner in which the Defendant answered or evaded the post *Miranda* questions (related to a wide variety of subjects), was influenced by his answers to limited pre-*Miranda* questions about various automobiles. Further, there does not appear to be any common "substance" between the first conversation and later interview under *Elstad*, *Siebert*, or *Mashburn* because there was no confession to any crime by the Defendant, prewarning or postwarning. Finally, although there was minimal common subject matter, the prewarning responses of the Defendant about automobiles were not of like "substance" under *Elstad*, *Siebert*, or *Mashburn* in an incriminating way which had any impact on his decision to later waive his rights and answer questions about multiple subjects. Thus, no portion of the post-*Miranda* interview should be excluded.

### III. CONCLUSION

For all the reasons set forth in this Supplement to Response and others to be argued at the hearing of the matter, the Defendant's pre-*Miranda* and post-*Miranda* statements during the audio recorded interview were voluntary, and the post-*Miranda* statements were made after he knowingly, intelligently, and voluntarily waived his rights.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney
District of Maryland

By: _____
William D. Moomau
Dana J. Brusca
Assistant United States Attorneys
United States Attorney's Office
District of Maryland
6500 Cherrywood Lane, Suite 200
Greenbelt, MD  20770

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of August, 2021, the foregoing Supplement to Response was filed electronically and thus served upon defense counsel.

_____
William D. Moomau
Assistant United States Attorney