**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. PX-18-631** |
| | * | |
| **SCOTT ANTHONY WILLIAMS, and** | * | |
| **TAEYAN RAYMOND WILLIAMS** | * | |
| | * | |
| **Defendants.** | * | |
| | ****** | |

**GOVERNMENT'S OPPOSITION TO
TAEYAN WILLIAMS'S MOTIONS TO SUPPRESS**

As set forth in the government's detailed opposition to the motions filed by defendant Scott Williams, since April 2018 members of law enforcement from New York, Pennsylvania, and Maryland have been investigating the disappearance and murder of 23-year-old Noah Smothers, a large-scale marijuana trafficker.[1]  *See* ECF 43, at 1-13.   The findings of that investigation— summarized in Exhibit 1 to the Government's Omnibus Response to Scott William's motions (hereafter, "2019 Federal Search Warrant")—reflect a gruesome, well-planned murder and a robbery of Smothers' storage unit, following which the defendants sought to conceal evidence of their crimes by disposing of Smothers's car in the dead of night miles away from his last use of it.

When the investigation was at its nascent stages, in May 2018, investigators knew far less about Smothers's drug trafficking and his involvement with defendants Scott and Taeyan Williams.  Indeed, although the defendants were charged by indictment on December 19, 2018, with conspiracy to distribute controlled substances (namely marijuana, cocaine, and more than 500

---

[1] The government hereby incorporates and repeats all representations, contentions, and arguments in its opposition to Scott Williams's motions to suppress filed at ECF 43 and ECF 104.

grams of methamphetamine),[2] ECF 1, it was not until a year later, on December 18, 2019, that the grand jury returned a superseding indictment charging defendant Scott Williams with murder in furtherance of that drug trafficking conspiracy, ECF 38.

But, even though the details of the crimes were not initially known, there was assuredly probable cause to believe—even then—that Taeyan was connected to Smothers's disappearance. Accordingly, members of the Maryland State Police began obtaining warrants to search locations, physical and electronic, related to Taeyan.  He has now moved to suppress two of these warrants: (i) a warrant for Taeyan's cell phone records sworn on May 16, 2018,[3] attached as Exhibit A, and (ii) a warrant for Taeyan's Facebook records sworn on May 16, 2018, attached as Exhibit B.[4] These motions should be denied.

The challenged warrants thoroughly and accurately alleged the facts as they were then known:  that Smothers disappeared immediately after a meeting in Baltimore, Maryland to sell narcotics to Taeyan and Taeyan's uncle; that Smothers's last known location was 1200 feet from Taeyan's home in Laurel, Maryland; that Smothers's storage unit in Jessup, Maryland was broken into twice and its contents emptied in the days following Smothers's disappearance; that

---

[2] Scott Williams was also charged in both indictments with Possession with the Intent to Distribute narcotics, in violation of 21 U.S.C. §841, and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c).  ECF 1 & 38.

[3] The first paragraph of the defendant's motion states he has moved "to exclude from evidence the results of a search of his social media accounts [and] cell phone records."  ECF 100, at 1.  Later in the motion, the defendant states that "[o]n May 16, 2018, Corporal Kyle Simms . . . sought and obtained a warrant to search the contents of Mr. Williams' social media accounts and cell phone records."  *Id.* at ¶ 2.  The defendant does not appear to have moved for suppression of the defendant's cell phone records obtained by warrant dated June 26, 2018.  However, the arguments set forth herein apply with equal measure to this later warrant as well.

[4] Defendant Taeyan Williams has also moved to suppress the evidence seized from his apartment in West Virginia.  *See* ECF 100, at 1.  The government does not plan to use any evidence obtained from that search in its case-in-chief and, therefore, this aspect of the defendant's motion is moot.

Smothers's car was driven at 4:00 a.m. on the night of Smothers's disappearance to a parking lot in Baltimore, Maryland by someone other than Smothers; that when the car was dumped, the driver wiped it down with a rag and then entered a Nissan Altima that had been rented to Scott Williams, an occupant in the same Laurel home as Taeyan Williams; and, that when Smothers's car was later recovered by law enforcement it was covered in blood.

In short, the warrants established probable cause to believe Taeyan Williams had engaged in various crimes relating to Smothers's disappearance and that evidence, fruits, and instrumentalities of those crimes would be found in Taeyan's cell phone records and social media accounts. But, even if they did not, the executing officers reasonably relied on the warrants in good faith.

## BACKGROUND

On April 12, 2018, Smothers's parents reported to police that their son, Noah, was missing.[5] Exhibit A, at 4; *see generally* Exhibit B (Exhibit B is substantially similar except where noted to Exhibit A). Smothers's parents told police that Smothers travelled "up and down the east coast," selling marijuana, cocaine, and ecstasy at various college campuses. *Id.* Smothers's parents further stated that Smothers frequently stayed at "Air BNB rooms" in whatever town he was conducting business, and that Smothers used a storage unit in Jessup, Maryland to store his drugs before distributing them to campus buyers. *Id.*

Smothers's parents told police that immediately prior to his disappearance Smothers had travelled to Baltimore, Maryland to meet with two Baltimore residents: "Tae" and Tae's "uncle."

---

[5] Smothers hailed from upstate New York, where his parents then lived. Accordingly, the initial missing person report was made to New York State Police. Exhibit A, at 4. After several weeks of initial investigation. upon learning that Smothers's last known location was in Laurel, Maryland, the New York State Police contacted the Maryland State Police for assistance. *Id.*

*Id.* The meeting was one of business—specifically, a sale of cocaine—to which Smothers was reportedly bringing "samples" of narcotics. *Id.* at 4, 8.

Smothers made the trip to Baltimore on April 5, 2018 in a rented 2017 Kia Sportage. *Id.* at 4 & 5. He was last heard from the next day, on April 6, 2018. *Id.* at 4. Smothers's parents had access to many of Smothers's online, telephone, and banking accounts and they were concerned that Smothers had apparently not engaged in any cellular, banking, or social media activity since April 6, 2018—the date of his last known drug sale. *Id.* According to Smothers's parents, prior to April 6, Smothers used his bank card and cell phone daily. *Id.*

Subsequent investigation established that Smothers's parents were worried with good reason: In the days following Smothers's disappearance, someone accessed the Jessup storage facility where Smothers housed his narcotics on at least three occasions.[6] Although Smothers's private access PIN had been used to open the facility's gates each time, it was seemingly *not* Smothers who had used it. *Id.* at 4. Rather, facility employees reported that the handheld lock on Smothers's individual unit had been cut twice in the period from April 8 to April 12, 2018, and its contents entirely emptied. *Id.* at 4. Security cameras at the facility also captured the car that entered the storage premises on April 6, 7, and 8, after Smothers's PIN had been used to open the facility's gates. The video established that it was not the 2017 Kia Sportage (a crossover SUV)

---

[6] To access Smothers's storage unit, an individual would need both a code to open the facility's electronic gate and, once inside the facility's property, a key/combination to open the detachable lock securing Smothers's rented unit. As set forth in the affidavit of Cpl. Kyle Simms dated October 2019, an individual used Smothers's PIN to gain entry to Smothers's Jessup storage facility on April 6 and 7. 2019 Federal Search Warrant, at 13-14. Smothers's entry PIN was also used to access the facility on April 8 and 12. *Id.* at 15; Exhibit A, at 4. On these later dates, facility records confirmed that the door to Smothers's individual unit was in fact opened as well. *See* 2019 Federal Search Warrant, at 15; Exhibit A, at 4.

that Smothers had driven to Baltimore on April 5; rather, the car on all three dates appeared to be a Nissan sedan.  2019 Federal Search Warrant, at 13-15.

Still worse, later in April, investigators obtained surveillance video from a housing complex in Baltimore establishing that Smothers's rental car had pulled into the building's parking lot at approximately 4:00 a.m. on April 7, 2018 (the day after Smothers had gone missing and after Smothers's scheduled meeting with "Tae" and "Tae's uncle").  Exhibit A, at 5.  The individual driving Smothers's car could not be positively identified due to the video's quality and distance from the driver, but the driver did not appear to be Smothers.  Smothers, a former basketball player, was 6'6" and over 200 pounds; the vehicle's driver (when compared to the height of the Kia Sportage) appeared smaller, and also of a darker complexion than Smothers.  *Id*.

Surveillance video showed that Smothers's Kia Sportage was followed during this 4:00 a.m. April 7 drop-off by a Nissan Altima—a car of the same size and shape as the Nissan sedan that accessed Smothers's storage facility on April 6, 7, and 8.  The Altima bore Massachusetts tag "5XY974."  *Id.*  Rental records established that this Altima was owned by Enterprise and that, on April 7, 2018, the Altima had been rented to a "Scott Anthony Williams" of Laurel Maryland.  *Id.*

The video surveillance also showed the driver of Smothers's Kia wiping down the interior of the car with a rag.  *Id.* at 5.  Once finished, the driver of the Kia entered the Nissan Altima rented to Scott Williams.  *Id.*  From the video, it appeared that the individual who had driven and cleaned Smothers's car was wearing a red hooded shirt.  *Id.*  So too was the individual who had driven a Nissan sedan to Smothers's storage facility, leading investigators to believe that it was the same individual pictured in both sets of surveillance footage.  *Id.* at 5, 8.

When law enforcement located Smothers's Kia Sportage several weeks after it had been abandoned, officers took photographs of the car's interior.  These photographs corroborated the

surveillance video showing the vehicle's driver wiping it down with a rag before entering Scott Williams's Nissan Altima at approximately 4:00 a.m. on the morning of April 7 because visible throughout the car's interior was residue consistent with a cleaning agent.  *Id.* at 6; 2019 Federal Search Warrant, at 17.   In addition, when processed by the Maryland State Police Crime Lab, forensic specialists observed in Smothers's rented Kia the presence of blood on the car's tailgate, rear liftgate, and rear bumper.  Exhibit A, at 6.  There was also blood found in the door jamb and on the rear passenger side door.  When Luminol was used, the forensic technicians observed a large area of blood on the back or the rear seats and cargo area in the vehicle's trunk.  *Id.*  None of Smothers's personal effects were located inside the recovered vehicle.  *Id.* at 7-8.

Based on the large amounts of visible and non-visible blood, the 4:00 a.m. surveillance video showing Smothers's car being wiped down and abandoned, and the apparent robbery of Smothers's storage unit in the days after Smothers's disappearance, investigators began researching the individual who had rented the Nissan Altima viewable during the April 7 dump of Smothers's car—Scott Anthony Williams.  Investigators determined that Scott Williams lived at 10301 Bristolwood Court, Laurel, Maryland, at a residence owned by an apparent relative (Carl Williams).  *Id.* at 5.  Law enforcement databases reflected that Scott Williams had several cars registered to him at the Bristolwood address and that the home's apparent owner (Carl Williams) in fact resided elsewhere.  *Id.*  The databases further reflected that an individual named Taeyan Raymond Williams was an occupant of the Bristolwood home.  *Id.*  Based on the similarity of the name "Taeyan" and the nickname "Tae" provided to them by Smothers's parents, and the proximity of Laurel to Baltimore, investigators "believed" that Taeyan Raymond Williams was in fact that "Tae" with whom Smothers was on April 6, 2018, meeting for a potential drug sale, *id.*, and that Scott Williams's was "Tae's uncle."   Further confirming the investigators belief of

Smothers's involvement with Scott and Taeyan Williams were the results of Smothers's last known cell phone activity.  These records confirmed that Smothers's phone was last active on April 6, 2018, at 1:58 p.m.  *Id.* at 7.  At that time, Smothers's phone "pinged" at GPS coordinates located approximately 1200 feet from the Williams's Bristlwood residence.  *Id.*

As these events were unfolding, Smothers's parents contacted police to report a number for the "Tae" that Smothers was supposed to meet in Baltimore: (681) 404-1855.  *Id.* at 6. Smothers's parents reported that this number had been given to them by one of Smothers's associates.  *Id.*  The family further reported that a private investigator called the cell phone number, (681) 404-1855, and the person who answered the phone acknowledged that his name was "Tae." *Id.*  "Tae" denied knowing anyone by the name "Noah Smothers" and, after receiving a photograph of Smothers from the investigator, failed to answer any additional calls or messages and did not confirm or deny his relationship with the pictured individual.  *Id.* at 6-7.

Law enforcement officers additionally found through public records searches two Facebook profiles associated with Taeyan Williams.  The first account actually displayed the name "Taeyan Williams" and contained photographs of the individual suspected to be involved Smothers, Taeyan Raymond Williams.  Exhibit B, at 9.  The profile page for the account further stated that the user resided in Columbia, Maryland, an address consistent with a previous address for Taeyan Williams, and had attended Howard Community College, as had the Taeyan Williams of interest in Smothers's disappearance.  *Id.*  The second account also displayed the name "Taeyan Williams" at the top of the page, but there was little publicly viewable information about the second account user—except that the user again resided in Columbia, Maryland and attended Howard Community College, the same as the first Taeyan Williams account.  *Id.*

Based on the totality of the circumstances and the information obtained to that point, law enforcement officers subsequently obtained on May 16, 2018, a warrant to search the cell phone records associated with cell phone number (681) 404-1855 and the two Facebook accounts associated with Taeyan Williams.  *See* Exhibits A and B.

**ARGUMENT**

Taeyan moves to suppress the evidence obtained during the execution of the search warrants on his cell phone records and Facebook accounts.  Taeyan argues that (i) the affidavits are not support by probable cause, and (ii) the executing officers were not entitled to rely on the warrants in good faith.  Both arguments are without merit.

## I.   THE AFFIDAVITS WERE SUPPORTED BY PROBABLE CAUSE.

Though "not subject to a precise definition," probable cause "plainly 'exist[s] where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found.'"  *United States* v. *Allen*, 631 F.3d 164, 172 (4th Cir. 2011) (quoting *Ornelas* v. *United States*, 517 U.S. 690, 696 (1996)).  Because probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—" it is "not readily, or even usefully, reduced to a neat set of legal rules."  *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983).  Consequently, probable cause requires a court to consider "the whole picture," rather than each fact in isolation.  *District of Columbia* v. *Wesby*, 138 S. Ct. 577 (2018); *cf. United States* v. *DeQuaise*, 373 F.3d 509, 518 (4th Cir. 2004) (the probable cause standard does not "require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information").  Indeed, in assessing probable cause, a judge must make "a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence

of a crime will be found in a particular place." *Allen*, 631 F.3d at 172 (quoting *Gates*, 462 U.S. at 238). But the law "does not demand showing that such a belief be correct or [even] more likely true than false." *United States* v. *Williams*, 974 F.2d 480, 481 (4th Cir. 1992) (per curiam).

Once a search warrant has been issued, the issuing judge's finding of probable cause is entitled to "great deference." *United States* v. *Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (quoting *Gates*, 462 U.S. at 213)). A reviewing court's task "is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record" supporting the decision to issue the warrant. *Massachusetts* v. *Upton*, 466 U.S. 727, 728 (1984); *accord United States* v. *Chandia*, 514 F.3d 365, 373 (4th Cir. 2008).[7] Accordingly, the test is "whether the magistrate had a substantial basis . . . for concluding that probable cause existed." *United States* v. *Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990); *accord Hurwitz*, 459 F.3d at 473. Because there was more than a substantial basis for the probable cause findings made by the issuing judges, the Court should deny Taeyan's motions to suppress the fruits of the challenged warrants.

As summarized above, the challenged affidavits clearly alleged that prior to his disappearance Noah Smothers was set to meet with an individual named "Tae" and "Tae's Uncle" to discuss a sale of narcotics. The meeting was to take place in Baltimore, Maryland on April 6, 2018, where Smothers stored his narcotics in a nearby storage facility located in Jessup, Maryland. After travelling to Baltimore for the drug sale, Smothers was never heard from again and his various banking, cellular, and social media accounts (to which Smothers's parents had access) reflected no activity after April 6. In addition, Smothers's storage facility was accessed—as

---

[7] The Court should also recognize that warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation," *United States v. Clenney*, 631 F.3d 658, 664 (4th Cir. 2011), and "must be interpreted in a commonsense manner, neither held to the standard of what judges or lawyers feel they would have written if given the opportunity nor judged as an entry in an essay contest." *United States v. Pulley*, 987 F.3d 370, 380 (4th Cir. 2021).

established by video surveillance and facility records—by an individual whose physical characteristics did not match Smothers' and who was driving a car that had no known association with Smothers, but who used Smothers's personal PIN to gain entry to the facility. Further, twice in the week after Smothers's disappearance Smothers's storage unit was apparently burglarized, and its contents emptied.

Subsequently, Smothers's own car was observed on video surveillance driving at 4:00 a.m. into the parking lot of a Baltimore apartment complex. The driver did not have the same physical characteristics as Smothers (the driver was shorter and of a darker complexion). When the driver exited Smothers's vehicle, he wiped it down with a rag and then entered a Nissan Altima with Massachusetts tag "5XY974" that had followed Smothers's car into the lot. That Altima had been rented by Scott Anthony Williams of Laurel, Maryland.

Officers later confirmed that Scott Williams was a resident in Laurel, Maryland and that another occupant in Scott's home was "Taeyan," i.e., "Tae," Williams." They further confirmed that telecommunications records for Smothers's last known cell phone activity placed him approximately 1200 feet away from the Williams's home.

Finally, when it was recovered at the end of April 2018, Smothers's car (dumped in a parking lot on April 7, 2018 where it remained until picked up by the rental company that had leased it) was covered in large quantities of blood.

With respect to the locations to be searched in the challenged warrants, police obtained a known telephone number for Taeyan. Specifically, one of Smothers's associates provided Smothers's parents with Taeyan's number, (681) 404-1855. Although unstated, the associate was clearly and inferentially aware of Smothers's narcotics trafficking or would have no way of obtaining Taeyan's number. When Smothers's family hired a private investigator to contact

Taeyan, the individual who answered the call confirmed that he was "Tae."  Taeyan denied knowing anyone by the name "Noah Smothers," but refused either to confirm or deny knowing Smothers when he received a photograph of him.  They further confirmed that Taeyan Williams was linked to two different Facebook profiles, one in the name of Taeyan Williams and one with the same personal information (job and city of residence) but apparently hidden from public view.

These facts and circumstances, taken together as a whole, undoubtedly established probable cause to believe that crimes—including kidnapping, robbery, murder, and drug trafficking—had been committed and that Taeyan and Scott Williams were involved in the commission thereof.  The defendant does not meaningfully argue otherwise.  He instead appears to take issue, first, with the timeliness of the warrants, suggesting probable cause was stale; and, second, he argues there was an insufficient nexus between the locations to be searched and the crimes at issue.[8]  ECF 100, at 2 (¶¶ 5-6).  Each argument fails.

### A.    The Probable Cause Supporting the Affidavits Was Timely.

In evaluating whether the evidence supporting probable cause in a warrant is stale, "[t]he court's fundamental concern . . . is always the same: did the facts alleged in the warrant furnish probable cause to believe, at the time the search was actually conducted, that evidence of criminal activity was located at the premises searched?"  *United States* v. *McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984).  "This question is not resolved by reference to pat formulas or simple rules," and the

---

[8] To the extent the defendant challenges the credibility of the information provided by Smothers's parents, *see* ECF 100, at 2-3, this challenge is unfounded.  "[W]hen examining informant evidence used to support a claim of probable cause for a warrant . . . the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness."  *Easton* v. *City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985); *see also United States* v. *Doyle*, 650 F.3d 460, 472–73 (4th Cir. 2011) (citing *Easton* v. *City of Boulder* with approval).  Accordingly, the magistrate judge appropriately relied upon the statements of Smothers's parents here in finding probable cause.

"vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit." *Id.*  Rather, a court "must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." *Id.*  In this case, the totality of the circumstances confirms that the probable cause alleged by the affiant was not stale.

First, the time between the crimes alleged (occurring from April 6 to April 12, 2018) and the swearing of the affidavits on May 16, 2018, was no more than six weeks.  Courts routinely uphold warrants based on probable cause that is months or even years old when there is reason to believe that the evidence is still maintained.  Here, the short period of time between the crimes and the warrants should result in a presumption the probable cause was timely.  Indeed, in this very case, even though Smothers's car was not recovered for several weeks after its abandonment— and then only after it had been returned to the rental dealership and rented by a new user—forensic evidence confirming Smothers's murder was recovered:  his blood and DNA were in numerous locations in the rear and trunk of the vehicle.  *See* 2019 Simms Federal Affidavit, at 17.

Second, the locations to be searched in each of the challenged warrants were electronic records in the custody of independent third-party service providers.  The Fourth Circuit has recognized that "[f]indings of staleness become less appropriate when the instrumentalities of the alleged illegality tend to be retained." *United States* v. *Crowffey*, 182 F. App'x 249, 250 (4th Cir. 2006) (unpublished); *United States* v. *Farmer*, 370 F.3d 435, 439–40 (4th Cir. 2004) (holding that evidence was not stale even though events supporting probable cause took place nine months before search warrant was issued).  "Evidence not likely to become stale includes records of payment, bank statements, canceled checks, receipts, phone records, and electronic devices."

*United States* v. *White*, 2017 WL 2633521, at \*4 (M.D.N.C. June 19, 2017) (citing *Farmer*, 370 F.3d at 439–440, *and United States* v. *Willis*, 2015 WL 1915123, at \*3 (W.D.N.Y. Apr. 27, 2015)).

Here, the records sought were not likely to have grown stale in the six weeks since Smothers's disappeared.  Rather, as stated in the supporting affidavit for Taeyan's cell phone records, records of Taeyan's location in the weeks immediately prior to and following Smothers's disappearance remained "critical" to the resolution of the case.  This was because, as detailed in the affidavit, Smothers was associated with a number of locations in and around Baltimore, Maryland in the days surrounding his death:  a storage facility in Jessup, Maryland (which was visited both before and after Smothers's disappearance and was accessed in all instances using Smothers's private PIN), a location 1200 feet from the Williams's Bristolwood residence in Laurel. Maryland, and a parking lot in Baltimore, Maryland where Smothers's rental vehicle was recovered.  Assuredly, if cell phone records—which were themselves historical in nature—placed Taeyan's phone near any of these locations at or near the time of Smothers's disappearance, those records would constitute strong evidence of Taeyan's involvement in the events described. Conversely, if Taeyan's phone's location data affirmatively indicated he was elsewhere at these dates and times, it would help inform officers of the direction any future investigation might take.

Additionally, although Smothers was scheduled to meet Taeyan in person on April 6, 2018, Smothers's parents informed police that Smothers was engaged in a long-running poly-drug trafficking business and that he frequently travelled up and down the east coast delivering narcotics to college campuses and maintained a storage facility in Jessup, Maryland for storage of his narcotics.  To the extent Taeyan's phone records put him in touch with Smothers to arrange either the April 6 meeting or any other drug deals, that too would be evidence of the crimes alleged. Finally, because cell phone records are maintained not by the cell phone user but the

telecommunications company that provides service to the phone, the magistrate judge was entitled to infer (correctly) that the servers of the phone company—which was the location to be searched—would contain the evidence sought. *Cf. United States* v. *Valdez*, 2020 WL 7700338, at *3-5 (W.D.N.Y. Oct. 9, 2020) (probable cause supporting affidavit for historical cell site information was not stale even though events alleged were between eleven and four months old).

The same arguments apply with equal force to the warrant authorizing the search of Taeyan's Facebook records. In the supporting affidavit for Taeyan's Facebook records, affiant Cpl. Simms drew on his training, experience, and specialized knowledge to detail the reasons why, despite even the short passage of any time, it was probable that evidence of the crimes alleged would be located in the place to be searched. *See United States* v. *Arvizu*, 534 U.S. 266, 273 (2002) ("When discussing how reviewing courts should make reasonable suspicion determinations, we have said repeatedly that they must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.") (internal citations omitted). In his affidavit, Cpl. Simms detailed his eight years of experience investigating Homicides and Controlled Dangerous Substance Offenses. Exhibit B, at 1-3. He further noted that in his experience executing search and seizure warrants, individuals engaged in such crimes typically conceal evidence, fruits, and property connected to their crimes on their persons, in their vehicles, in their homes or places of employment, or in other areas of storage including garages, sheds, or—in the context of electronic evidence—in their cellular telephones, computers, or removable storage devices. *Id.* at 3. Cpl. Simms explained that individuals engaged in criminal

14

acts, including narcotics offenses, use various forms of communication including cell phones, text messaging, email, and social media platforms to facilitate their criminal acts and communicate with coconspirators. *Id.* at 4. Finally, Cpl. Simms detailed the types of messages and records maintained by Facebook for Facebook users, which included videos, posts, direct messages between Facebook users, contact information including email addresses, login records, and associated IP addresses. *Id.* at 3-4.

Given that (i) Taeyan's Facebook accounts were apparently still active and at least partially viewable immediately prior to the obtaining of the warrant, (ii) Smothers's storage unit—believed to contain narcotics—had only weeks before been emptied of its contents by an individual believed to be Taeyan, and (iii) Cpl. Simms experience in narcotics cases during which he had previously and routinely observed conspirators communicating through social media, the probable cause to search Taeyan's Facebook profiles was not stale.

**B.    There Was A Sufficient Nexus Between the Crimes and the Locations to be Searched.**

In evaluating whether there is a sufficient nexus to support a warrant, the question is "whether it is reasonable to believe that the *items* to be seized will be found in the *place to be searched*." *United States* v. *Wienke*, 733 F. App'x 65, 69–71 (4th Cir. 2018) (per curiam) (citing *United States* v. *Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993)). Such nexus "may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *United States* v. *Anderson*, 851 F.2d 727, 729 (4th Cir. 1988). In making these "normal inferences" about the location to be searched, "officers may draw conclusions from their experience, judgment, and observations." *Wienke*, 733 F. App'x at 69–71. Thus, courts routinely hold that "a sufficient nexus can exist between a defendant's criminal conduct and his residence even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought to the

15

defendant's residence." *See, e.g.*, *United States* v. *Grossman*, 400 F.3d 212, 217 (4th Cir. 2005); *accord Wienke*, 733 F. App'x at 69–71 ("Because it is reasonable to infer that weapons, photographs, and other documents would be found in a person's home, the allegations in the warrant application provided a sufficient nexus between the items to be seized and Wienke's residence); *United States* v. *Vanderweele*, 545 F. App'x 465, 469 (6th Cir. 2013) (per curiam) (holding that training-and-experience statement—that firearms and "related items are commonly stored" in owner's residence—established sufficient nexus); *Williams*, 974 F.2d at 481 (reversing district court suppression of warrant to search hotel room of known drug dealer despite absence in affidavit of any evidence linking motel to drug activity because "the magistrate must consider, in the light of all the surrounding circumstances, the likelihood that drug paraphernalia would be found in the motel room of a known drug dealer").

Likewise, a sufficient nexus can exist between digital evidence and the crime alleged even though officers do not have ex ante information linking a *particular* electronic account or device to the crime. *See, e.g.*, *United States* v. *Weigand*, 482 F. Supp. 3d 224, 241 (S.D.N.Y. 2020) ("The charged crime is conspiracy, so communications with alleged co-conspirators, and evidence regarding such communications, is directly relevant.  The affidavit tends to show that [the defendant] used encrypted messaging applications and encrypted email to communicate about the alleged conspiracy.  There was, thus, probable cause to believe that evidence of the alleged conspiracy would have existed on electronic devices possessed by [the defendant].").  This is because, as with a residence, "[t]he nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."  *Anderson*, 851 F.2d at 729.

As detailed above, here there was evidence that Smothers had communicated with Taeyan about a sale of narcotics to take place on April 6—a sale during which Smothers was set to provide samples of his narcotics. The night of that scheduled sale, individuals with unknown associations to Smothers gained access to Smothers's storage facility in which Smother's kept narcotics. One of these individuals appeared to have been wearing a red sweatshirt. Further, when Smothers's car was abandoned early in the morning on April 7, it was driven by an individual wearing a red hooded shirt and followed by a car that had been rented by one of Taeyan's relatives. These facts established probable cause to believe that Taeyan was involved in narcotics trafficking and had access to Smothers's narcotics stored in the Jessup storage facility.

In addition, one of Smothers's associates had and was able to provide to Smothers's parents a cell phone number for Taeyan. This fact alone suggests that Taeyean communicated regarding narcotics through his cell phone—indeed, there was no basis to believe that either Smothers and Taeyan, or Smothers's associate and Taeyan, had any association with Taeyan apart from narcotics dealing. Further, insofar as there was probable cause to believe that Taeyan Williams had robbed Smothers's storage facility and, thereafter, had narcotics to sell, there was sufficient nexus between Taeyan and his Facebook accounts through which he could be communicating (like other individuals engaged in the sale of narcotics) about narcotics deals. These connections were sufficient evidence of nexus between the crimes alleged and the locations to be searched. *See, e.g.*, *United States* v. *Worthy*, No. TDC-18-0062, 2019 WL 1441172, at *2 (D. Md. Apr. 1, 2019) (where this is probable cause to believe an individual is engaged in drug trafficking, "some evidence" in the warrant that the target used phones to communicate about criminal activity relating to drug dealing, and the affiant's training and experience statement regarding the connection between drug dealing and cell phones, there was sufficient nexus to search cell phones

seized from the target) (quoting, among other cases, *United States* v. *Slater*, 971 F.2d 626, 637 (10th Cir. 1992) (acknowledging that a cellphone is "recognized tool of the trade in drug dealing"))); *United States* v. *Fischer*, No. RDB-14-413, 2015 WL 1862329, at *2 (D. Md. Apr. 22, 2015) (finding sufficient nexus to uphold cellphone warrant based on evidence of drug dealing and affiant's training-and-experience-based attestation that cellphones are tools of drug traffickers (citing *United States* v. *Gibson*, 547 F. App'x 174, 185 n.1 (4th Cir. 2013) (Davis, J., concurring))); *United States* v. *Tsarnaev*, 53 F. Supp. 3d 450, 462 (D. Mass. 2014) (affiant's statements that targets used social media and email and statement that, in the affiant's training, knowledge, and experience, individuals use these forms of communication to provide location information and and to plan and discuss criminal schemes established a nexus between alleged Boston marathon bombers and electronic accounts to be searched).

## II.   OFFICERS RELIED UPON THE WARRANTS IN GOOD FAITH.

"[A] search carried out pursuant to a warrant is presumed valid." *United States* v. *Mandell*, 752 F.3d 544, 551 (2d Cir. 2014). Thus, when executing a warrant issued by a magistrate judge, there is a presumption that "a law enforcement officer has acted in good faith in conducting the search." *United States* v. *Leon*, 468 U.S. 897, 922 (1984). This is because, in "the ordinary case, an officer cannot be expected to question the magistrate's probable cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." *Id.* at 921 (internal quotation marks omitted).

However, there are four circumstances in which the *Leon* good faith exception will not apply: (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) if "the issuing magistrate wholly abandoned his judicial role in the manner

condemned in *Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979)"; (3) if the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and, (4) if under the circumstances of the case the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *United States* v. *DeQuasie*, 373 F.3d 509, 519–20 (4th Cir. 2004) (quoting *Leon*, 468 U.S. at 923 (internal punctuation omitted)). As the Supreme Court has explained, the question in assessing good faith "is not whether the magistrate erred in believing there was sufficient probable cause to support the scope of the warrant he issued.  It is instead whether the magistrate so *obviously* erred that any reasonable officer would have recognized the error," a standard which will be met only "rare[ly]." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).[9]

The defendant does not suggest that in the challenged warrants the magistrate judges wholly abandoned their judicial role and became part of the prosecution team, nor that the warrants are in any way facially deficient.  *See generally* ECF 100.  Rather, the defendant argues, that "[t]he information contained in the warrant with respect to Taeyon Williams is either a knowing or reckless disregard for the truth and/or provides an insufficient factual basis as to the underlying alleged criminal conduct."  ECF 100, at 2 (quotation marks omitted).  Neither ground provides a sufficient basis to find the officers here acted in bad faith.

---

[9] Though *Messerschmidt* is a Section 1983 case, the Supreme Court has applied the same test for both good faith and qualified immunity.  565 U.S. at 546-48 (citing *Leon*, 468 U.S. at 922-923).

A. **The Defendant Has Not Alleged with Specificity Any False Statements in the Challenged Affidavits, Made Knowingly or Recklessly, That Are Material to Probable Cause**.

A defendant is generally "not entitled to challenge the veracity of a facially valid search warrant affidavit by way of a motion to suppress." *United States* v. *Pulley*, 2021 WL 485454, *3 (4th Cir. Feb. 10, 2021); *accord United States* v. *Allen*, 631 F.3d 164, 171 (4th Cir. 2011).

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court "carved out a narrow exception to this rule." *Allen*, 631 F.3d at 171. *Franks* permits a defendant to "challenge the truthfulness of factual statements made in the affidavit, and thereby [to] undermine the validity of the warrant and the resulting search or seizure." *Mandell*, 752 F.3d at 521-522. A defendant is entitled to an evidentiary hearing under *Franks* if he can make a "substantial preliminary showing" that (1) the warrant affidavit contained a false statement, (2) the false statement was included intentionally or recklessly and (3) the false statement was "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-156. Thus, a *Franks* inquiry has three distinct components, falsity, intentionality and materiality. *See United States* v. *Wharton*, 840 F.3d 163, 168 (4th Cir. 2016).

A defendant seeking a *Franks* bears a "heavy burden." *United States* v. *Jeffus*, 22 F.3d 554, 558 (4th Cir. 1994). He must make allegations that are "more than conclusory" and that are "accompanied by a detailed offer of proof" as to all parts. *United States* v. *Colkley*, 899 F.2d 297, 300 (4th Cir. 1990); *accord United States* v. *Chandia*, 514 F.3d 365, 373-74 (4th Cir. 2008) (*Franks* hearing not required where motion to suppress made only "bare allegations," failing to make "substantial preliminary showing" by presenting "offer of proof" either in the form of "affidavits or sworn or otherwise reliable statements of witnesses" or by "satisfactorily explain[ing] their absence").

As to falsity, in particular, "the defendant cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts.  Rather, there must be evidence showing that the statements at issue are objectively false."  *United States* v. *Moody*, 931 F.3d 366, 370 (4th Cir. 2019).  Here, the defendant has not identified *any* particular fact in the affidavit that he alleges is false, much less made a "detailed offer of proof" establishing falsity.

Nor, to the extent he maintains that the affidavit is in some way false, has he identified any basis to believe that the misrepresentations were included by the affiant knowingly or recklessly. "An innocent or even negligent mistake by the officer will not suffice.  [Rather,] here too, the defendant must provide facts—not mere conclusory allegations—indicating that the officer subjectively acted with intent to mislead, or with reckless disregard for whether the statements would mislead, the magistrate."  *Moody*, 931 F.3d at 371.

Finally, in light of the other shortcomings, there has been no argument—and no basis to conclude—any inaccurate statements were material to the finding of probable cause.

Because he has failed to meet his heavy burden, the defendant's motion to suppress the warrants based on any summarily alleged inaccuracy should be denied.

**B.**   **The Affidavits Here Were Not "Bare Bone" And the Officers Were Objectively Reasonable In Relying Upon Them.**

In its opinion in *Leon* the Supreme Court noted that its "opinion should not be read to suggest that 'an officer could obtain a warrant on the basis of a bare bones affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search.'"  *United States*. v. *Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996) (quoting *Leon*, 468 U.S. at 923 n. 24).   A "bare bones" affidavit is one that contains "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause."  *United States* v. *Laury*, 985 F.2d 1293, 1311 n. 23 (5th Cir. 1993).

21

Thus, courts have routinely rejected the application of *Leon's* good faith exception to the exclusionary rule where a warrant is based only on an anonymous tip with scanty police corroboration.  *E.g.*, *Wilhelm*, 80 F.3d at 121-22 (rejecting application of *Leon* where warrant was based on anonymous tip and not corroborated); *accord id.* at 122 (citing *United States* v. *Leake*, 998 F.2d 1359, 1367 (6th Cir.1993) (rejecting *Leon* good-faith exception where warrant was supported by "an anonymous tip with scanty police corroboration" because the affiant "knew that he needed to provide corroboration of the tip, but did not") and others).

But when, as here, the source of a tip is known to law enforcement officers and the circumstances of the tip provide indicia of reliability, a tip alone—without further corroboration—may provide the basis for a warrant that is *not* "bare bones" for purposes of finding officers acted in good faith under *Leon*.  In *United States* v. *DeQuasie,* for example, police officers spoke to a husband and mother who reported that they had learned from a third relative that the victim was being held against her will at a nearby home and being forced to use cocaine.  373 F.3d at 512. The officers completed a missing person report and drove to the reported residence for purposes of adequately describing it in a search warrant.  *Id.* at 513.  At that time officers observed several individuals at the residence but little else.  *Id.*  The district court, comparing the case to *Wilhelm*, found that the warrant lacked probable cause and was so bare bones that the officers could not be found to have executed it in good faith.  *Id.* at 515.

The Fourth Circuit—considering only the application of *Leon*—reversed.  *Id.* at 520.  The Court first noted that the warrant in *Wilhelm* was "supported only by an affidavit that 'depended on information from an unnamed informant, and provided no indication of that informant's truthfulness or reliability.'"  *Id.* at 522 (quoting *Wilhelm*, 80 F.3d at 120).  The Court then reasoned that the affidavit in front of it was "markedly different":  the affiant in *DeQausie* specifically

identified his sources, indicated he had met with them face-to-face, completed a missing person report, and acknowledged that much (but not all) of the information from the victim's reporting relatives came from a third relative to whom officers apparently did not speak.  *Id.*  Although the Fourth Circuit recognized that the officers did "not independently corroborate the information reported by [the victim's relatives] (to whatever extent it could have been corroborated)," it found that "the nature and circumstances of the report itself provide[d] several indicia of reliability that were absent in the *Wilhelm* affidavit."  *Id.* at 522-23.  Specifically, the Fourth Circuit explained:

- "an informant who meets face-to-face with an officer provides the officer with an opportunity to assess his credibility and demeanor and also exposes himself to accountability for making a false statement," thereby distinguishing "cases involving face-to-face encounters [from] cases involving anonymous tipsters," *id.* (quoting *United States* v. *Christmas*, 222 F.3d 141, 144 (4th Cir. 2000));

- "if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability— . . . rigorous scrutiny of the basis of his knowledge [is] unnecessary," *id.* (quoting *Gates*, 462 U.S. at 233–34); and,

- "an informant's personal interest can create "a strong motive to supply accurate information," *id.* (quoting *United States* v. *Miller*, 925 F.2d 695, 699 (4th Cir.1991).

In short, because the victim's relatives met with officers to provide information for a missing person report thereby providing officers with the opportunity to assess their demeanor and credibility and exposing themselves to liability for filing a false police report; had an obvious personal interest in the victim's wellbeing; and had presented no other reasons for doubt of their credibility, the Fourth Circuit found the information in the affidavit was sufficiently reliable and not bare bones to warrant application of *Leon*.  *Id.*

The circumstances here are wholly on a par with *DeQuasie*.  The "tip" regarding Smothers's disappearance was reported by a known source—Smothers's parents—and they had every interest in being truthful because they wanted to locate their missing son.  Further, Smothers's parents provided substantial information about Smothers's drug trafficking, thereby

potentially exposing their son and possibly themselves to criminal liability.  They also provided details including the location, date, and counter parties for a particular drug sale in which Smothers's was involved:  in Baltimore, on or about April 6, 2018, with "Tae" and "Tae's Uncle," which the officers ultimately corroborated through two sets of surveillance video associating the defendants with Smothers's abandoned vehicle and Smothers's storage facility (where Smothers kept narcotics); Smothers's phone records, which confirmed Smothers's last known location was 1200 feet from the defendants' home; and, "Tae's" phone number provided by one of Smothers's associates which was called and answered by "Tae."  What is more, when Smothers's abandoned car was recovered it was covered in blood and when checked by facility employees Smothers's storage unit had been emptied.  These facts and the substantial amount of investigation completed by investigators in only a few weeks' time provided more than sufficient probable cause for the magistrate judge to issue the challenged warrants.  And, even if they did not, the warrants were not so obviously lacking in probable cause that the executing officers should be deemed to have executed them in bad faith.

*       *       *

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Government's Omnibus Response to Defendant [Scott Williams's] Motions set forth at ECF 43,[10] the evidence obtained from the challenged search warrants should not be suppressed.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney
District of Maryland

By: _____/s/_____
William D. Moomau
Dana J. Brusca
Assistant United States Attorneys

United States Attorney's Office
District of Maryland
6500 Cherrywood Lane, Suite 200
Greenbelt, MD  20770

---

[10] Defendant Taeyan Williams has moved to adopt the motions made by his co-defendant, Scott Williams.  Scott moved to (i) dismiss the indictment, (ii) sever Count Four, (iii) suppress evidence from the search of Scott's residence, 10301 Bristolwood Court, Laurel, Maryland, and (iv) suppress Scott's statements made June 6, 2018 during the execution of the foregoing warrant at 10301 Bristolwood.  For the reasons set forth in the government's response at ECF 43, these motions with respect to issues (i) through (iii) should be denied also with respect to Taeyan.  With respect to issue (iv), the suppression of *Scott's* statements, Taeyan does not have standing to suppress them. *Cf. United States* v. *Chivola*, 744 F.2d 1271, 1273–74 (7th Cir. 1984) ("Generally, individuals not personally the victims of illegal government activity cannot assert the constitutional rights of others" though in some cases, such as the use of evidence obtained through extreme coercion or torture, a "violation of another person's fifth amendment rights may rise to the level of a violation of [the defendant's own] rights to a fair trial").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of August, 2021, the foregoing Opposition to Taeyan

Williams's Motions to Suppress was filed electronically and thus served upon all counsel of record.

_____/s/_____
Dana J. Brusca
Assistant United States Attorney